THE FIRST NATIONAL BANK IN OLNEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 258–63.   Filed August 30, 1965.

*Walter J. Rockler, David R. Kentoff,* and *Edgar H. Stenn,* for the petitioner.

*Nelson E. Shafer,* for the respondent.

WITHEY, *Judge:* The Commissioner has determined deficiencies in the income tax of the petitioner in the amounts of $3,975.99, $7,070.44, $5,330.43, and $7,543.15 for the years 1957, 1958, 1959, and 1960, respectively. The sole issue presented is the correctness of the Commissioner's action in disallowing deductions of $7,646.14, $10,207.58, $10,267.69, and $14,856.87 taken by petitioner in its income tax returns for 1957, 1958, 1959, and 1960, respectively, as additions to its reserve for bad debts for the respective years.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioner is a national bank incorporated and doing business under the laws of the United States with its principal place of business in Olney, Ill. Petitioner was organized on July 9, 1934, and continuously since that date has been engaged in the general banking business. Its Federal corporation income tax returns for the years 1957 through 1960, prepared on the calendar year basis, were filed with the district director in Springfield, Ill.

For its taxable years prior to 1947 the petitioner took deductions for bad debts by the specific chargeoff method. Following the pub-

lication in December 1947 of Mim. 6209, 1947–2 C.B. 26, and beginning with its taxable year 1947 the petitioner adopted the reserve method of accounting for its bad debts.   In so accounting for bad debts the petitioner utilized a 20-year moving average experience factor for determining the amounts of its additions to its reserve for bad debts, used a substitute bad debt experience of Olney Trust & Banking Co., sometimes hereinafter referred to as Olney Trust, Olney, Ill., for 1934 and prior years, and used its own bad debt experience for years subsequent to 1934.   The petitioner had no bad debts for the period July 9, 1934, the date of its organization, through December 31, 1934.

Following the publication of Rev. Ruls. 54–148, 1954–1 C.B. 60, and 54–597, 1954–2 C.B. 90, which supplemented Mim. 6209, the petitioner beginning with its income tax return for the taxable year 1954, which was executed on March 12, 1955, and continuing through the taxable years in issue herein, computed the annual addition to its reserve for bad debts by using an average bad debt loss experience factor of 0.0171 based on the average of the total percentages of its annual bad debt loss or gain to the annual net closing balance for each of the 20 years from 1929 through 1948, sometimes referred to in the record as "a frozen base period of computation of reserve."   The method by which the petitioner determined the foregoing average bad debt loss experience factor of 0.0171 is shown in Exhibit 5–E, which was placed in evidence by stipulation of the parties, and which shows the following:

| Year | (1) Closing loan balance | (2) Ineligible loans | (3) Net closing loan balance [column (1) — column (2)] | (4) Loans written off during year | (5) Recoveries during year | (6) Net bad debts (loss (or gain)) [column (4) — column (5)] | (7) Ratio [column 6÷ column 3] |
|---|---|---|---|---|---|---|---|
| 1929 | $634,448.89 | | $634,448.89 | $730.96 | | $730.96 | 0.001 |
| 1930 | 546,324.61 | | 546,324.61 | 495.00 | | 495.00 | .001 |
| 1931 | 524,881.92 | | 524,881.92 | 1,648.25 | | 1,648.25 | .003 |
| 1932 | 484,172.34 | | 484,172.34 | 805.00 | | 805.00 | .002 |
| 1933 | 423,447.27 | | 423,447.27 | 608.50 | | 608.50 | .001 |
| 1934 | 224,655.11 | | 224,655.11 | 56,401.32 | | 56,401.32 | .251 |
| 1935 | 242,476.49 | | 242,476.49 | | | | |
| 1936 | 316,157.52 | | 316,157.52 | 900.78 | $8.00 | 892.78 | .003 |
| 1937 | 407,982.28 | $190,651.03 | 217,331.25 | 714.50 | 274.31 | 440.19 | .002 |
| 1938 | 496,095.55 | 212,050.66 | 284,044.89 | 40.75 | 93.00 | (52.25) | |
| 1939 | 572,933.39 | 260,366.69 | 312,566.70 | 2,786.16 | | 2,786.16 | .009 |
| 1940 | 556,206.35 | 236,394.57 | 319,811.78 | 7,277.90 | 315.16 | 6,962.74 | .022 |
| 1941 | 559,750.20 | 219,140.03 | 340,610.17 | 2,867.68 | 694.76 | 2,172.92 | .006 |
| 1942 | 447,534.49 | 184,712.33 | 262,822.16 | 4,912.50 | 192.23 | 4,720.27 | .018 |
| 1943 | 348,837.37 | 151,320.61 | 197,516.76 | 3,292.17 | 1,456.62 | 1,835.55 | .009 |
| 1944 | 297,638.88 | 125,903.07 | 171,735.81 | 2,317.50 | 209.06 | 2,108.44 | .012 |
| 1945 | 378,191.24 | 103,156.51 | 275,034.73 | 441.74 | 1,326.00 | (884.26) | (.003) |
| 1946 | 722,710.84 | 86,705.71 | 636,005.13 | 166.82 | 255.00 | (88.18) | |
| 1947 | 799,603.64 | 67,242.27 | 732,361.37 | 1,260.55 | 357.47 | 903.08 | .001 |
| 1948 | 1,015,144.92 | 59,461.49 | 955,683.43 | 3,662.75 | 370.75 | 3,292.00 | .004 |
| | | | | | | | .342 |

Experience factor (average of the total percentages—0.342÷20)=0.0171

Amounts shown in Exhibit 5–E above in columns (1) and (3), closing loan balance and net closing loan balance, do not include loan amounts which were written off as bad debts during any of the years involved in the exhibit. The amounts shown in column (3), net closing loan balance, represent outstanding loan balances at the end of the year reduced by the amount of ineligible loans such as unearned discounts, hypothecated loans, and applicable portions of Government insured or guaranteed loans. The amounts shown in column (6), net bad debts loss (or gain), represent, except for the year 1934, bad debts written off during the year and net of bad debt recoveries during the year. Net bad debt (gain) represents recoveries in excess of write-offs.

In computing the foregoing experience factor, the petitioner used or adapted the bad debt experience of Olney Trust for the years 1929 through 1934. On an undisclosed date prior to or during July 1933, Olney Trust was closed and placed in receivership under a receiver appointed by the auditor of public accounts of the State of Illinois, sometimes hereinafter referred to as State auditor. Thereafter, and until August 7, 1934, Olney Trust continued closed and in receivership and was engaged in the process of liquidation. There is no showing that during that period any part of its business consisted of receiving deposits and making loans and discounts. About April or May 1934, representatives of Olney Trust contacted the State auditor respecting the termination of the receivership and the reopening of Olney Trust for normal banking business.

About June 1934, auditors for the State auditor made an examination of the assets and affairs of Olney Trust and concluded that certain of the assets were bad. On an undisclosed subsequent date at a meeting of such auditors and the directors of Olney Trust, the auditors recommended that certain assets, which they had concluded were bad, be charged off by Olney Trust after its reopening for normal banking business. On August 7, 1934, Olney Trust, as a result of some arrangement not disclosed by the record, reopened for normal banking business. Thereupon, on that date, it eliminated from its assets, accounts receivables in the amount of $144,268.20 which the auditors for the State auditor had recommended be charged off upon the reopening of Olney Trust for normal banking business. The foregoing $144,268.20 of receivables consisted of (1) $1,270.50 listed as bad debts deducted from income but which represented bad debt writeoffs attributable to 1933 and other account adjustments and (2) an undescribed group of loans totaling $142,997.70 which were written off and charged to earned surplus.

In determining its substituted experience for 1934, petitioner made an adaptation of Olney Trust's bad debt experience for 1934 substantially as follows:

| | |
|---|---:|
| Loans written off and charged to earned surplus by Olney Trust on Aug. 7, 1934 | $142, 997. 70 |
| Less: Nontaxable recoveries by Olney Trust subsequently in 1934 | 4, 100. 73 |
| Net bad debts originally written off by Olney Trust in and for 1934 | 138, 896. 97 |
| Less: Olney Trust's subsequent recoveries during 1935 through 1947, on 1934 net bad debt writeoff (per petitioner) | 82, 495. 65 |
| Net bad debts adapted by petitioner and substituted for 1934 | 56, 401. 32 |

Olney, Ill., has a population of approximately 10,000. Petitioner and Olney Trust are the only commercial banks in Olney. The petitioner serves Olney and that part of the surrounding farming community situated within a radius of about 15 miles from the center of Olney. The petitioner's loan portfolio during the 1930's and 1940's, as well as during the years in issue herein, consisted of approximately one-third each of first mortgage real estate loans, consumer credit loans, and commercial personal loans, with the maximum amount of any particular loan not exceeding $40,000. First mortgage real estate loans customarily were made for amounts up to a maximum of 60 percent of the appraised value of the property, for a maximum period of 10 years with amortization to be made under the terms of the loan. Customarily loans on new automobiles were made in amounts up to two-thirds of the cost thereof for periods of from 2 to 3 years, and loans on used automobiles were made in amounts up to one-half the cost thereof for periods of about 2 years. Loans on consumer appliances were made in amounts up to about two-thirds of the cost thereof for periods of from 1 to 2 years. Loans on farm machinery were made for periods of from 2 to 3 crop years. Loans on farm animals were made for periods of from 6 months to a year in amounts of approximately one-half of their value in case of animals owned by the farmer and up to the full amount of cost of feeder animals being purchased. Some of the loans which were secured by negotiable securities or instruments were made payable on demand but most of such loans were due in 6 months to a year.

Olney Trust draws its customers from Olney and that part of the surrounding area within a radius of 15 or 20 miles therefrom. During the 1930's and 1940's Olney Trust made loans of the same classes as those made by petitioner during that time.

The respective averages of the total percentage of annual net bad debt loss (or gain) to the annual net closing loan balance of petitioner and Olney Trust for the period 1935 through 1947 were as follows:

| | Petitioner | Olney Trust [1] |
|---|---|---|
| 1935–47 | 0.61 percent | 1.06 percent. |

[1] Recoveries on Olney Trust's net bad debt writeoff in 1934 disregarded.

The respective cumulative averages of aggregate net bad debt loss (or gain) to aggregate net closing loan balance of petitioner and Olney Trust for the period 1935 through 1947 were as follows:

|  | Petitioner | Olney Trust [1] |
|---|---|---|
| 1935–47 | 0.51 percent | 0.94 percent. |

[1] Recoveries on Olney Trust's net bad debt writeoff in 1934 disregarded.

The respective averages of the annual total percentages of "ineligible loans" to closing loan balances of petitioner and Olney Trust for the period 1935 through 1947 were as follows:

|  | Petitioner | Olney Trust |
|---|---|---|
| 1935–47 | 35.56 percent | 19.03 percent. |

The respective cumulative averages of "ineligible loans" to closing loan balances of petitioner and Olney Trust for the period 1935 through 1947 were as follows:

|  | Petitioner | Olney Trust |
|---|---|---|
| 1935–47 | 29.90 percent | 3.14 percent. |

The following is a statement of the petitioner's beginning reserve for bad debts, loans written off by it during the year, loan recoveries during the year, net bad debts, net closing loan balance, additions to reserve for bad debts during the year, and yearend balance of reserve for bad debts for the years 1949 through 1960 as shown by petitioner's income tax returns for the respective years:

| Year | Beginning balance reserve for bad debts | Loans written off during year | Loan recoveries during year | Net bad debts | Net closing loan balance | Addition to reserve for bad debts during year | Yearend balance of reserve for bad debts |
|---|---|---|---|---|---|---|---|
| 1949 | $25,463.72 | $170.16 | $1,358.61 | [1] ($1,188.44) | $1,033,567.13 | $17,570.64 | $44,222.81 |
| 1950 | 44,222.81 | 966.77 | 200.00 | 766.77 | 1,188,997.12 | 17,182.81 | 60,638.85 |
| 1951 | 60,638.85 | | 75.00 | [1] (75.00) | 1,262,521.46 | 3,674.73 | 64,388.58 |
| 1952 | 64,388.58 | 78.00 | | 78.00 | 1,406,550.94 | 7,423.53 | 71,734.11 |
| 1953 | 71,734.11 | | 25.00 | [1] (25.00) | 1,430,071.16 | 1,174.52 | 72,933.63 |
| 1954 | 72,933.63 | 720.00 | 25.00 | 695.00 | 1,504,006.65 | 1,638.96 | 73,877.59 |
| 1955 | 73,877.59 | 2,388.79 | 180.51 | 2,208.28 | 1,626,655.74 | 5,889.06 | 77,558.37 |
| 1956 | 77,558.37 | | 292.19 | [1] (292.19) | 1,628,186.54 | 5,675.41 | 83,525.97 |
| 1957 | 83,525.97 | | 221.15 | [1] (221.15) | 1,781,544.98 | 7,646.14 | 91,393.26 |
| 1958 | 91,393.26 | 387.00 | 248.74 | 138.26 | 1,977,828.00 | 10,207.58 | 101,462.58 |
| 1959 | 101,462.58 | | 2,568.77 | [1] (2,568.77) | 2,228,051.22 | 10,267.69 | 114,299.04 |
| 1960 | 114,299.04 | 50.00 | 134.66 | [1] (84.66) | 2,519,309.29 | 14,856.87 | 129,240.57 |

[1] Net recovery.

The total amount of loans charged off by petitioner during the period from its organization on July 9, 1934, through 1960, a period of approximately 26½ years, was $35,452.52; the total of recoveries

on loans charged off during the period was $10,881.99, or net loans charged off of $24,570.53 for the period. The annual average amount of net loans charged off during the period was $926.19. The total of loans written off by petitioner during the 12-year period 1949 through 1960 was $4,760.72, and the total of recoveries during this period on loans written off was $5,329.63, or an excess for the period of recoveries over loans written off of $568.91, or an average annual excess of recoveries net of $47.41. The total of loans written off by petitioner during the 5-year period 1956 through 1960 was $437, and the total of recoveries during that period on loans written off was $3,465.51, or an excess for the period of recoveries over loans written off of $3,028.51, or an annual average excess of recoveries of $605.70.

In its Federal income tax returns for the years 1957, 1958, 1959, and 1960, petitioner took deductions for additions to its reserve for bad debts in the respective amounts of $7,646.14, $10,207.58, $10,267.69, and $14,856.87, computed as follows:

|  | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|
| (a) Net closing loan balance [1] | $1,781,544.98 | $1,977,828.00 | $2,228,051.22 | $2,519,309.29 |
| (b) Bad debt loss experience factor | 0.0171 | 0.0171 | 0.0171 | 0.0171 |
| (c) Annual limitation ((a)×(b)) | $30,464.42 | $33,820.86 | $38,099.68 | $43,080.19 |
| (d) Reserve limitation ((c)×3) | $91,393.26 | $101,462.58 | $114,299.04 | $129,240.57 |
| (e) Reserve before addition | 83,747.12 | 91,255.00 | 104,031.35 | 114,383.70 |
| (f) Deductions taken ((d)−(e)) | $7,646.14 | $10,207.58 | $10,267.69 | $14,856.87 |

[1] Net closing loan balance represents the closing loans outstanding at the end of the year, reduced by the amount of "ineligible loans" such as Government insured or guaranteed loans. Figures for the net closing loan balance do not include loan amounts which were written off as bad debts during any of the years in question.

In determining the deficiencies in issue the respondent disallowed the foregoing deductions taken by petitioner as additions to its reserve for bad debts for the indicated years on the ground that petitioner had not established that it was entitled to such deductions.

The balance of the petitioner's reserve for bad debts as of January 1, 1957, $83,525.97, was adequate and reasonable without any additions thereto for the years 1957 through 1960.

### OPINION

The single issue presented for determination is whether the respondent erred in disallowing the deductions taken by petitioner for the years in controversy as additions to its reserve for bad debts for the respective years. That issue is one of fact and is to be resolved by a determination of the fundamental question of whether the respondent in disallowing any deductions for additions to petitioner's reserve for bad debts, has unreasonably exercised the discretion vested

in him by section 166 (c) of the Internal Revenue Code of 1954 which provides as follows:

SEC. 166.   BAD DEBTS.

   (c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

Ordinarily, deductions based upon reserves are not allowed under the revenue laws, cf. *Brown* v. *Helvering*, 291 U.S. 193 (1934), and this was true originally as to bad debts. Section 166(c) of the Code represents an exception to the general rule by allowing as a deduction "(in the discretion of the Secretary or his delegate) * * * a reasonable addition to a reserve for bad debts."[1] However, Congress was unwilling to give the taxpayer an absolute right to such deduction and explicitly made it contingent upon the discretion of the Secretary or his delegate, the respondent here. As was stated in *C. P. Ford & Co., Inc.*, 28 B.T.A. 156, 158–159 (1933):

A taxpayer has an absolute right to choose to deduct his worthless debts when they are ascertained to be worthless and charged off, but if instead he chooses to deduct additions to a reserve, he subjects himself to the reasonable discretion of the Commissioner. Reserves of any sort are not ordinarily deductible * * * and when Congress so far departs from the customary practice as to permit such a deduction as to a bad debt reserve, the condition is as important as the permission. Such a deduction presents substantial problems of administration, and it can not be assumed that Congress intended either that the taxpayer's unrestrained judgment as to the propriety or wisdom of his method or that the Board's judgment in a particular case when not supported by broad administrative considerations as well as the taxpayer's individual premises should override the Commissioner's sound discretion. That the Board has jurisdiction to review his determination does not mean that its judgment is to be substituted for that of the Commissioner merely because both may be within the bounds of reason. This may mean nothing more than that the Commissioner's determination is presumed to be correct, but Congress seems to have given the presumption greater emphasis by its express legislation than that of the general presumption which applies to all determinations of deficiencies.

See also *Walter H. Goodrich & Co.*, 40 B.T.A. 960, 961–962 (1939); *Krim-Ko Corporation*, 16 T.C. 31 (1951); *Union National Bank & Trust Co. of Elgin*, 26 T.C. 537 (1956); *Newlin Machinery Corporation*, 28 T.C. 837 (1957); *Miners National Bank of Wilkes-Barre*, 33 T.C. 42 (1959); *American State Bank* v. *United States*, 176 F. Supp. 64 (E.D. Wis. 1959), affd. 279 F. 2d 585 (C.A. 7, 1960), certiorari denied 364 U.S. 881 (1960).

From what has been said above it is apparent that under the provisions of section 166(c) the respondent has been granted wide lati-

---

[1] Similar pertinent statutory language first appeared in sec. 234(a)(5) of the Revenue Act of 1921. Prior thereto, the deduction for bad debts was allowed only if the debts were ascertained to be worthless and charged off within the taxable year. See, e.g., sec. 234(a)(5) of the Revenue Act of 1918.

tude in exercising the discretion conferred on him by that section and that the burden of establishing an abuse of discretion falls heavily upon the taxpayer. Consequently, where the respondent has allowed or refused to allow any deductions for additions to reserves for bad debts, the taxpayer must present to this Court sufficient facts to show that the respondent acted arbitrarily or unreasonably.

The petitioner's overall contention is that in computing the additions to its reserve for bad debts for the years in issue, it has complied with all of the pertinent provisions of Mim. 6209 and Rev. Ruls. 54–148 and 57–350, supplementary thereto, and that therefore it is entitled to the deductions taken by it for such years for additions to its reserve for bad debts. The respondent, taking the position that an addition to a reserve for bad debts which is properly computed under Mim. 6209 and related rulings will constitute a reasonable addition, contends that petitioner's computation of the additions in issue failed to comply with Mim. 6209 and related rulings in that: (1) The petitioner has failed to show that the substituted experience of Olney Trust which it used for the years 1929 through 1934 was derived from "other similar banks with respect to the same type of loans," and (2) the petitioner used the bad debt experience of Olney Trust for the entire year of 1934 during substantially the last half of which the petitioner was in existence and had no bad debts. The respondent further contends that, as a consequence of the foregoing failure of the petitioner, the petitioner's additions to its reserve for bad debts here in issue must be judged, solely, under the statutory standard of "reasonable addition" as to which the petitioner has offered no evidence.

Mim. 6209 reads in part as follows:

1. The Bureau has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the proper measure of such reserves, and amounts to be allowed as deductions.

2. In determining a reasonable annual addition to a reserve for bad debts by a bank it is believed to be fair and sufficiently accurate to resort to the average annual bad-debt loss of the bank over a period of 20 years, to include the taxable year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. * * *

3. The Bureau has accordingly approved the use by banks of a moving average experience factor for the determination of the ratio of losses to outstanding loans for taxable years beginning after December 31, 1946. Such a moving average is to be determined on a basis of 20 years, including the taxable year, as representing a sufficiently long period of a bank's experience to constitute a reasonable cycle of good and bad years. * * *

4. In computing the moving average percentage of actual bad debt losses to loans, the average should be computed on loans comparable in their nature and risk involved to those outstanding at the close of the current taxable year involved. * * *

5. A newly organized bank or a bank without sufficient years' experience for computing an average as provided for above will be permitted to set up a reserve

commensurate with the average experience of other similar banks with respect to the same type of loans, preferably in the same locality, subject to adjustment after a period of years when the bank's own experience is established.

* * * * * * *

8. The term "banks" as used herein means banks or trust companies incorporated and doing business under the laws of the Uniteed States (including laws relating to the District of Columbia), of any State, or any Territory, *a substantial part of the business of which consists of receiving deposits and making loans and discounts.*

[Emphasis added. 1947–2 C.B. 26–27, 28.]

Rev. Rul. 54–148 reads in part as follows:

Section 1. Purpose.

The purpose of this Revenue Ruling is to supplement Com-Mimeograph Coll. No. 6209 dated December 8, 1947 (C.B. 1947–2, 26), which authorizes, in the case of banks, a special method for computing a reasonable addition to the reserve for bad debts under section 23(k)(1) of the Internal Revenue Code and the regulations promulgated thereunder.

Sec. 2. Background.

The Service has carefully reexamined the provisions of Mimeograph 6209, *supra*, in the light of experience developed thereunder and, as a result of such reexamination, has approved an alternative method for the use of banks in computing the annual addition to the reserve for bad debts and the maximum amount permitted to be accumulated in such reserve, as set forth in section 4 hereunder.

Sec. 3. Definition of Terms.

The term "banks" as used herein means banks or trust companies incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any State, or of any Territory, *a substantial part of the business of which consists of receiving deposits and making loans and discounts.* Such term as used in Mimeograph 6209 and herein does not include mutual savings banks not having capital stock represented by shares, domestic building and loan associations, or cooperative banks without capital stock organized and operated for mutual purposes and without profit.

Sec. 4. Alternative Method.

.01 In lieu of the moving average experience factor provided in paragraph 3 of Mimeograph 6209, which is determined on a basis of 20 years including the taxable year, a bank may use an average experience factor based on any 20 consecutive years of its own experience after the year 1927. Such average experience factor, representing the percentage of bad debt losses to loans for the period selected, applied to loans outstanding at the close of the taxable year, determines the maximum permissible addition to the reserve for the year.

* * * * * * *

.03 Consistent with the provisions of Mimeograph 6209 which permit newly organized banks and banks *without sufficient years' experience of their own* to set up a reserve commensurate with the average experience of other similar banks with respect to the same type of loans, preferably in the same locality, *banks which select a 20-year* period under (.01) above which *extends back into years for which they have no experience of their own* will be permitted to fill in such years with similar comparable data.

.04 The provisions of paragraph 6 of Mimeograph 6209 relating to the treatment of specific bad debt losses and recoveries, *and all other rules utilized in the application of Mimeograph 6209 shall, to the extent not inconsistent, be applicable to the alternative method.*

Sec. 5. Effect on Other Documents.

This Revenue Ruling merely supplements Mimeograph 6209 by providing an additional or alternative method for computing the annual addition to a reserve for bad debts and the maximum amount permitted to be accumulated in such reserve. Banks which are now using the moving average method provided in Mimeograph 6209 may continue to use that method if they so desire, and such method is still available to any other banks using or changing to the reserve method of accounting for bad debts.

[Emphasis added. 1954-1 C.B. 60, 61, 62.]

Rev. Rul. 54-597, 1954-2 C.B. 90, provides that for the purposes of Mim. 6209 and Rev. Rul. 54-148 a bank may compute its loss ratio on the basis of the total net losses for the 20-year period divided by the total outstanding loans for that period or on the basis of an average of the total percentages computed for each of the 20 years.

Rev. Rul. 57-350, 1957-2 C.B. 144-145, provides as follows:

In Revenue Ruling 54-148, C.B. 1954-1, 60, an alternative method of computing additions to a reserve for bad debts was approved for use by banks in lieu of the 20-year moving average method authorized in Mimeograph 6209, C.B. 1947-2, 26. Such alternative method contemplates that each bank using the reserve method of accounting for bad debts may select *any* 20 consecutive years after the year 1927 as an experience factor base, *regardless* of whether the bank was in existence, and therefore had experience of its own, for *all or part of the 20-year period selected.* For that portion of the 20-year period selected *during which the bank was in existence, it is required to use its own experience.* For that portion of the 20-year period selected during which the bank *was not in existence,* section 4.03 of Revenue Ruling 54-148, *supra,* permits a bank to fill in such years with the bad debt experience of other similar banks with respect to the same type of loans, preferably in the same locality. Thus, for example, a bank with continuous existence since December 31, 1933, may select the period 1930 through 1949, use its own bad debt experience for the years 1934 through 1949, and fill in the years 1930 through 1933 with the bad debt experience for those years of other similar banks, preferably in the same locality. [Emphasis added.]

Paragraph 4 of Mim. 6209 makes it clear that the 20-year moving average percentage of actual bad debt losses to loans is to be computed on loans comparable in their nature and risk involved to those of the taxpayer outstanding at the close of its current taxable year involved. Paragraph 5 of the mimeograph provides that in the case of a newly organized bank or a bank without sufficient years of experience for computing an average as provided in the mimeograph, it would be permitted to set up a reserve commensurate with the average experience of other similar banks, preferably in the same locality, with respect to the same type of loans, subject to adjustment after a period of years when the bank's own experience is established. Considering together the above-quoted provisions of paragraphs 4 and 5, we think it apparent such provisions contemplate that a bank which, because of its being newly organized or because of its not having had 20 years of experience, uses a substitute "average experience of other similar

banks," such experience is to be computed on "loans [of such other banks] comparable in their nature and risk involved to those [of the taxpayer] outstanding at the close of the [taxpayer's] current taxable year involved." The above-quoted provisions of Rev. Rul. 54–148 make it clear that the purpose and effect of that ruling were merely to supplement Mim. 6209 by providing an additional or alternative method for computing the annual addition to a reserve for bad debts and the maximum amount permitted to be accumulated in such reserve. The additional or alternative method permitted a bank to use an average bad debt experience factor based on any 20 consecutive years of its own experience after 1927 in lieu of the 20-year moving average experience factor provided in paragraph 3 of Mim. 6209. Rev. Rul. 54–148, in paragraph .03 of section 4 thereof, after referring to the permission granted in Mim. 6209 to newly organized banks and banks without sufficient years' experience to use substitute experience of other banks, provides that such banks which select the alternative method of 20 consecutive years which "extends back into years for which they have no experience of their own" will be permitted to fill in such years with "similar comparable data." That the "similar comparable data" referred to is a substitute experience computed as provided in Mim. 6209 is supported by the provisions of paragraph .04 of section 4 of Rev. Rul. 54–148 to the effect that the provisions of paragraph 6 of Mim. 6209 relating to the treatment of specific bad debt losses and recoveries, and *all other rules* utilized in the application of that mimeograph shall, to the extent not inconsistent, be applicable to the alternative method. We find nothing in Rev. Rul. 54–148 which renders inapplicable the provisions of Mim. 6209 requiring that a substituted bad debt experience used by a taxpayer bank be computed on "loans [of such other banks] comparable in their nature and risk involved to those [of the taxpayer] outstanding at the close of the [taxpayer's] current taxable year involved."

Rev. Rul. 57–350 provides in the case of a bank employing the alternative method set forth in Rev. Rul. 54–148 of computing additions to its reserve for bad debts based on any period of 20 consecutive years selected by it, that—

For that portion of the 20-year period selected during which the bank was in existence, it is required to use its own experience. For that portion of the 20-year period selected during which the bank was not in existence, section 4.03 of Revenue Ruling 54–148, *supra*, permits a bank to fill in such years with the bad debt experience of other similar banks with respect to the same type of loans, preferably in the same locality. * * *

In that ruling the application of the foregoing rule is illustrated in the instance of a bank with continuous existence since December 31, 1933, which had selected the alternative 20-year period, 1930 through 1949. In that case it is stated that the bank would use its own bad debt

experience for the years 1934 through 1949 and would use a substituted bad debt experience of other similar banks, preferably in the same locality, for the years 1930 through 1933.

An examination of the contentions of the parties in the light of the record and what has been said above discloses that the petitioner has failed to furnish a description of the loans constituting the bad debt experience of Olney Trust for the years 1929 through 1934 which the petitioner has used as its substituted bad debt experience for those years. Nor has petitioner furnished any other evidence with respect to such loans that shows that those loans were of the same type and comparable in their nature and risk involved as those of the petitioner outstanding at the close of its taxable years here in issue. Exhibit 5–E, set out in our findings, discloses that Olney Trust's net closing loan balance at the end of 1929 was approximately $634,449 and that in arriving at that balance loans in the amount of approximately $731 were written off during 1929. The exhibit further shows that the net closing loan balances thereafter declined substantially during each of the years 1930 through 1933 so that at the end of 1933 the net closing loan balance was approximately $423,447 after the writeoff in 1933 of loans in the amount of $608.50. On an undisclosed date prior to or during July 1933, Olney Trust was closed and placed in receivership. Thereafter, and until August 7, 1934, it remained closed and in receivership and engaged in the process of liquidation. There is no showing that during that period any substantial part of its business consisted of receiving deposits and making loans and discounts. Upon an examination of Olney Trust's assets and affairs about June 1934 by auditors for the State auditor, they concluded that certain of the assets were bad and subsequently recommended to the directors of the trust that such assets, including an undescribed group of loans totaling $142,997.70, be written off after the trust reopened for normal banking business. On August 7, 1934, Olney Trust, as the result of some undisclosed arrangement, reopened for normal banking business and thereupon, on that date, eliminated from its assets, receivables as recommended by the auditors for the State auditor, including the above-mentioned group of loans totaling $142,997.70, which were written off and charged to earned surplus. As shown by Exhibit 5–E, Olney Trust's net closing loan balance at the end of 1934 was approximately $224,655. As a result of its adaptation, the petitioner adopted and used $56,401.32, representing the eventually unrecovered portion of the above-mentioned undescribed group of loans totaling $142,997.70, as its substituted bad debt experience for the year 1934.

The respondent points out that the petitioner was organized on July 9, 1934, and from that date through December 31, 1934, had no bad debts; that at least from some undisclosed date in July 1933 until August 7, 1934, Olney Trust was in receivership and engaged in

the process of liquidation; that the loans comprising the bad debt experience of Olney Trust for 1934, which the petitioner has adopted as its substituted bad debt experience for that year, were ascertained to be bad at or about the time of the petitioner's organization and were not to be, and were not, charged off on the books of Olney Trust until more than a month after the organization of the petitioner; and contends that in that situation and under the provisions of Mim. 6209 and the provisions of Rev. Rul. 57–350 the petitioner is required to use its own experience for that portion of its selected 20-year experience period during which it was in existence. Reference to Exhibit 5–E shows that the total of the bad debt experience ratios shown therein for the 20-year period 1929 through 1948 and used by petitioner is 0.342; that of that total, ratios totaling 0.259, or more than 76 percent thereof, represent the bad debt experience ratios of Olney Trust for the 6 years 1929 through 1934; and that the bad debt experience ratio of Olney Trust for 1934 is 0.251 which in turn is 73.39 of the foregoing total of 0.342 representing the total of the bad debt experience ratios for the 20-year period. In other words, approximately three-fourths of the bad debt experience factor used by petitioner in computing the additions to its bad debt reserve for the years in issue results from the petitioner's use of its adapted bad debt experience of Olney Trust for the single year 1934. That result points up the significance in the controversy here of such use. In support of his contention the respondent relies on *First National Bank of La Feria*, 24 T.C. 429 (1955), affd. 234 F. 2d 868 (C.A. 5, 1956), and *Union National Bank & Trust Co. of Elgin*, 26 T.C. 537 (1956). The latter case was decided on authority of the former. In both of the cases the taxpayer banks contended that a change in loan policy from conservative to liberal, resulting from a change in ownership and management, warranted an expectation of larger losses than those reflected by the banks' actual past experience. The banks contended that this expectation required substitution of the experience of other banks for certain years of the 20-year moving average cycle, despite the fact that the taxpayer banks had been organized, in 1925 in the case of *La Feria* and in 1904 in the case of *Union*, and were in existence during the years for which substitution was proposed. In each case the Commissioner's disallowance of deductions taken for additions to the taxpayer bank's reserve for bad debts computed on the basis of substituted bad debt experience was sustained.

In construing Mim. 6209 in the case of *La Feria Bank*, we said at page 432:

We think it clear that under paragraph 5 of respondent's ruling, Mim. 6209, *supra*, a bank is required to use its own experience in determining its 20-year moving average experience factor, unless it is newly organized or does not have

a 20-year experience of its own, in which case it may use a substituted experience of another bank to complete the 20-year computation. * * *

It is our opinion that the foregoing is a fair and reasonable construction of paragraph 5 of Mim. 6209 and that the provisions of paragraph .03 of section 4 of Rev. Rul. 54–148 and Rev. Rul. 57–350 are consistent with such construction.

Respecting the purpose of the 20-year moving average experience provided for in Mim. 6209, we said in *La Feria Bank* at page 433:

> The purpose of the 20-year experience in computing the reserve for bad debts is to equalize between past bad debt experience and future bad debt expectations so that a particular bank may be recompensed for past losses by bringing the reserve to a maximum figure, before charging the reserve with current losses, and to provide the bank with a cushion adequate to protect it against anticipated future losses. Once the maximum reserve is reached the charges and the credits should balance out over a period of years. The difficulty in the instant proceeding is that petitioner's 20-year average extends back through the depression years of 1929 through 1934. During that period the loss ratios of the neighboring banks were much greater than those of petitioner as a result of the conservative banking practices of its management throughout that period, and continuing until 1943, when the petitioner's present manager acquired ownership and control. *There appears no reason for allowing petitioner a recompense based upon losses not suffered by it.* [Emphasis added.]

In our opinion what was said there as to the 20-year moving average experience is equally applicable to the alternative 20-year average experience provided in Rev. Rul. 54–148.

Here, the petitioner was organized on July 9, 1934, and thereafter through December 31, 1934, conducted its banking business in which it had no bad debts. Its bad debt experience during that period therefore was zero. It is true that at or about the time of the petitioner's organization auditors for the State auditor had concluded that a group of the assets of Olney Trust were bad and on some undisclosed date thereafter reported their conclusion to the directors of Olney Trust with a recommendation that such assets be charged off by the trust after it had reopened for normal banking business which occurred on August 7, 1934, on which date such assets were actually charged off by the trust. Since section 23(k) of the Revenue Act of 1934 provided for the allowance of a deduction for "Debts ascertained to be worthless and charged off within the taxable year" and the ascertainment and chargeoff both occurred in Olney Trust's taxable year 1934, the statutory requirements for the allowance of a deduction for bad debts for that year were met. However, the final act essential to the allowance of the deduction, namely, the chargeoff, did not occur until August 7, 1934, or approximately 1 month after the organization of the petitioner.

The petitioner urges that under the circumstances presented we should conclude that the date of the chargeoff, August 7, 1934, is to be related back to some unspecified date in 1934 prior to petitioner's

organization and hold that the indebtedness involved represented the bad debt experience of Olney Trust for that portion of 1934 prior to the organization of petitioner. The record is silent as to the circumstances and arrangement under which Olney Trust reopened for normal banking business. The record is also silent as to why, if the indebtedness was bad as concluded by the auditors, they did not recommend its immediate chargeoff, rather than recommend deferring its chargeoff until a future, indefinite, and so far as shown, uncertain date "after the reopening of Olney Trust." Where, as here, the chargeoff of an indebtedness is made at a time and under circumstances which do not indicate an intention that the chargeoff is to be related back to a date earlier than that upon which it was made, no basis exists for attributing the effectiveness of the chargeoff to a date earlier than that on which it was made. *First National Bank, Danville, Ind.*, 11 B.T.A. 671 (1928).

In our opinion there is an additional reason why the petitioner is not entitled to prevail here. The definition of the term "banks" in paragraph 8 of Mim. 6209 and in section 3 of Rev. Rul. 54–148 provides that that term as used therein means banks or trust companies incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any State, or of any Territory, "a substantial part of the business of which consists of receiving deposits and making loans and discounts." There is no showing that during the time Olney Trust was in receivership and engaged in the process of liquidation any part of its business consisted of receiving deposits and making loans and discounts. Consequently it does not appear that for that period the trust came within the definition of a bank within the meaning of Mim. 6209 and Rev. Rul. 54–148 and that its loans ascertained during that period to be bad were eligible for use as a substituted bad debt experience by petitioner for such period.

A somewhat similar question was presented in *Pullman Trust and Savings Bank* v. *United States*, 235 F. Supp. 317 (N.D. Ill. 1963), affd. 338 F. 2d 666 (C.A. 7, 1964). Involved in that case was the taxpayer which was organized on April 9, 1932, and is the bank of substantially the same name, which was organized in 1907, which during the period from April 30, 1932, to April 30, 1940, was in the process of liquidation, and which is hereinafter referred to as the old bank. Upon organization of the taxpayer, the directors and other officers of the old bank became its directors and officers and the banking operations of the old bank and those of the taxpayer bank were conducted by the same employees in the same premises. By reason of certain agreements between the taxpayer and the old bank and the transactions pursuant thereto respecting assets and liabilities of the old bank, the court concluded that the banking operation conducted by the tax-

payer and the old bank from April 30, 1932, through April 30, 1940, was a single integrated operation conducted within the framework of the dual corporate entities and that in substance the two corporations constituted a single bank. Having so concluded the court held that in a computation of the 20-year average bad debt experience factor of the taxpayer under Mim. 6209 and supplementary rulings the relevant bad debt experience for the years 1932 through 1940 is that of the taxpayer combined with that of the old bank.

In *Union National Bank of Youngstown* v. *United States*, 237 F. Supp. 753 (N.D. Ohio 1965), the taxpayer was organized on January 4, 1932, pursuant to a plan whereby it would (1) act as liquidating agent for two existing banks in Youngstown, Ohio, which were in financial difficulties and which hereinafter are referred to as the old banks, (2) enter into separate agreements with each of the old banks providing for the assumption of substantially all of their indebtedness and financial accounts of record existing on January 1, 1932, except the liabilities of the old banks to their stockholders, and (3) assume certain other liabilities of the old banks not shown on their books and records which might be asserted in the future, but only to the extent that it, the taxpayer, elected to pay and discharge such liabilities.

Pursuant to the aforementioned agreements, each of the old banks executed a note to the taxpayer in the amount of its, the respective old banks', deposit and other liabilities assumed by the taxpayer, and each of the old banks assigned substantially all of its assets to the taxpayer as security for the notes. Under the agreements the taxpayer was authorized to credit the proceeds received from liquidating the assets transferred to it by the respective old banks against the note indebtedness of the respective old banks to the taxpayer. The taxpayer was also authorized to select, as its own accounts, any of the assets, including loans, transferred to it by the old banks and to credit the value thereof to the note indebtedness of the respective old banks. Payment of the note indebtedness of the old banks to the taxpayer, hereinafter referred to as interbank loans, finally was completed and removed from the books of the taxpayer in 1942 and the old banks thereafter were liquidated.

The taxpayer located its main office in a building formerly occupied by one of the old banks. All of the employees of the taxpayer, except its president, were selected from the employees of the old banks, with the presidents of the old banks becoming vice presidents of the taxpayer. Some of the directors of the old banks became directors of the taxpayer. While the stockholders of the taxpayer were not identical with those of the old banks, the depositors and customers were substantially the same. The court concluded that the agreements between the taxpayer and the old banks did not require, suggest, or indicate a corporate merger, reorganization, or consolidation but merely

provided, in substance, for the liquidation of the old banks and the establishment of the taxpayer, which, thus formed, has always been an entity completely separate and independent of the old banks.

Following the issuance of Mim. 6209 in 1947, the taxpayer, in computing its average bad debt experience factor for the 20-year period, 1928 through 1947, used as a substituted experience the experience of the two old banks for the years 1928 through 1931 and the combined experience of itself and the two old banks for the years 1932 through 1947. Upon audit of the taxpayer's return for 1947 the Commissioner determined that petitioner was entitled to use as a substituted experience the experience of the two old banks for 1928 through 1931 and the combined experience of itself and the two old banks for 1932. He further determined that for the years 1933 through 1947 the taxpayer was entitled to use only its own bad debt experience. The taxpayer acquiesced in the foregoing determination and continued to compute its additions to its reserve for bad debts on the same basis (but using a moving 20-year period) until 1954. Beginning with its 1954 return the taxpayer adopted the alternative method provided in Rev. Rul. 54-148 and in that and later years used the combined experience of the old banks for the years 1928 through 1931, the combined experience of itself and the old banks for 1932, and the sole experience of itself for the following years. For the years 1954, 1955, and 1956 the Commissioner reversed his previous stand and determined that the taxpayer was entitled to use as a substituted experience the experience of only one of the old banks, the one having the higher bad debt experience, for the years 1928 through 1931 and was entitled only to its own experience for the years 1932 through 1947.

Before the court, the taxpayer, who sustained no bad debts in 1932, contended (1) that its efforts in 1932 were concentrated on the management of the loan portfolios of the two old banks of which it was liquidating agent and which included unusual or atypical circumstances that would be unlikely to recur, (2) that the taxpayer's own experience was insufficient to be representative and was of little value in determining a meaningful bad debt ratio, and (3) that the Commissioner was arbitrary, discriminatory, and unreasonable in disallowing the combined experience of itself and the two old banks for 1932. Concluding that the Commissioner's denial of the taxpayer's substituted experience for 1932 in computing the taxpayer's deductions for additions to its reserve for bad debts for 1954, 1955, and 1956 was unreasonable and therefore an abuse of the discretion granted the Commissioner under section 166(c) and that requiring the taxpayer to use its own experience for 1932 was also unreasonable, the court held for the taxpayer.

There is nothing in the record to show or to indicate that the petitioner and Olney Trust ever in any year entered into any agreements

and pursuant thereto engaged in any transactions, respecting the assets and liabilities of Olney Trust, or that they ever entered into any agreements with each other, or any transactions with each other which have any relationship to a computation of the additions made by petitioner to its reserve for bad debts for the taxable years in issue. Accordingly we conclude that because of their factual differences the holdings of the courts in the cases of *Pullman Trust and Savings Bank* and the *Union National Bank of Youngstown* are inapplicable and without persuasive or controlling effect here.

As a result of what has been said above we **are of** the opinion and so hold that petitioner has failed to establish that it has complied with the provisions of Mim. 6209 and supplementary rulings.

The remaining question for determination is whether, apart from the question of the failure of petitioner to establish that it has complied with Mim. 6209 and supplementary rulings, it nevertheless was entitled for the years in issue herein to the deductions taken in its income tax returns for additions to its reserve for bad debts.

Mim. 6209 does not have the force and effect of law nor do rulings supplementary thereto have such effect. *Miners National Bank of Wilkes-Barre, supra; American State Bank* v. *United States, supra; Union National Bank of Youngstown* v. *United States, supra; North Carolina National Bank* v. *United States*, 345 F. 2d 544 (Ct. Cl. 1965). The mimeograph and supplementary rulings were not issued as, and are not, regulations. Nor are they Treasury decisions issued as amendments to regulations. They only are, in the language of *Union National Bank & Trust Co. of Elgin, supra*, "declaratory of the Commissioner's position with respect to reasonable annual additions to reserves for bad debts by banks in general." Consequently, the failure of a taxpayer to show compliance with the mimeograph and supplementary rulings standing alone does not necessarily require an adverse decision any more than a showing of compliance standing alone necessarily requires a favorable decision. In each instance the decision must be based on the record as a whole.

The petitioner points out that in computing the addition to its reserve for bad debts for 1949 it used as substituted experience the bad debt experience of Olney Trust for 1934 and prior years and that upon audit of its return for 1949 the Commissioner accepted the return as filed. It urges that the respondent thus having accepted the method employed in computing the addition to the reserve for 1949 insofar as it involved the use of the experience of Olney Trust for 1934 and prior years, it ill behooved him to deny the deductions taken by it for additions to its reserve for bad debts for the years in issue, the computation of which also involved the use of the experience of Olney Trust for 1934 and prior years. In effect the petitioner takes the position that the respondent's approval of the addition made for 1949 bespeaks

the reasonableness and deductibility of the additions made during the subsequent years here in issue. Respecting a like position taken by the taxpayer in *C. P. Ford & Co., Inc., supra,* it was said:

This would mean that the Commissioner had discretion not as to the addition and its reasonableness, but only as to the initial approval of the method to be annually employed; that once the method is approved, the amount, however, inordinately large or small in the light of experience, may not be disallowed or increased. Manifestly the discretion was not intended to be so restricted. A method which produces a reasonable result for one year or even a series of years may in a given year be entirely out of tune with the circumstances. If so, it should not deprive the taxpayer of a deduction sufficiently large to reflect such changed circumstances, *Rhode Island Hospital Trust* v. *Commissioner*, 29 Fed. (2d) 339, and should likewise not entitle him to a deduction in excess of the amount reasonably necessary to provide for his probable bad debts. Since the reserve is necessarily the embodiment of estimates, the estimate for any year must be measured by the necessities of the reserve as those necessities appear at the time the estimate is made. So long as the method adopted accomplishes its purpose, there is reason for its consistent and continued use; but beyond that, it loses its force. [28 B.T.A. 159.]

In *Krim-Ko Corporation, supra,* we pointed out that the test or measure for determining the reasonableness and deductibility of additions to a reserve for bad debts is not whether the additions to the reserve are sufficient to absorb the bad debts that might arise during the years involved but whether the reserve itself was sufficient for that purpose. We there stated that if the respondent was justified in concluding, in the light of prevailing conditions, that the reserve already on the taxpayer's books was adequate, we cannot overturn his exercise of discretion to disallow further additions to the reserve.

The reserve for bad debts on the petitioner's books at the beginning of 1957, the first of the 4 taxable years in issue, was $83,525.97. The petitioner's total net bad debt experience from the time of its organization on July 9, 1934, through 1960, a period of 26½ years, was $24,570.53 of bad debts, or an annual average net bad debt experience for the period of $926.19. The petitioner's reserve for bad debts at the beginning of 1957 was approximately 3.4 times the petitioner's total net bad debt experience for the 26½-year period and more than 90 times the petitioner's average annual net bad debt experience for that period.

The petitioner's net bad debt experience for the 12-year period 1949 through 1960 was a net excess for the period in the amount of $568.91 of recoveries on loans written off over loans written off during the period, or an average annual net excess of recoveries of $47.41. The petitioner's net bad debt experience for the 5-year period 1956 through 1960 was a net excess for the period in the amount of $3,028.51 of recoveries on loans written off over loans written off during the period, or an average annual net excess of recoveries of $605.70. The petitioner's net bad debt experience for the 4-year period 1957 through

1960 was a net excess for the period in the amount of $2,736.32 of recoveries on loans written off over loans written off during the period, or an average annual net excess of recoveries of $684.08.

In the absence of a showing of any outside factors to affect petitioner's bad debt experience to any substantial extent, we are of the opinion that the evidence amply sustains the correctness of the respondent's action in disallowing the deductions taken by petitioner for the years in issue as additions to its reserve for bad debts. Any addition to the petitioner's reserve would increase the reserve to an amount the necessity of which is not disclosed by petitioner's past experience or by its prospects for the future. Accordingly we sustain the respondent's action.

*Decision will be entered for the respondent.*