Merchants Industrial Bank, a corporation organized and existing under the laws of the State of Colorado v. Commissioner.
Merchants Industrial Bank v. Commissioner
Docket No. 5681-69.
United States Tax Court
T.C. Memo 1972-18; 1972 Tax Ct. Memo LEXIS 236; 31 T.C.M. (CCH) 52; T.C.M. (RIA) 72018; January 25, 1972, Filed Richard R. Helmick, for the petitioner. Charles H. Powers, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioner's income *237 taxes as follows: 1965
$ 361.59
1966
279.98
1967
3,968.96
The sole issue to be decided is whether respondent properly disallowed portions of petitioner's additions to a reserve for bad debts for each of the years in question. Findings of Fact Some of the facts have been stipulated and, together with the exhibits attached to the stipulation, are incorporated herein by this reference. Petitioner, Merchants Industrial Bank, was organized as a corporation on November 26, 1958, under the laws of the State of Colorado. At all relevant times herein petitioner maintained its principal place of business in Denver, Colorado. It filed corporate income tax returns for each of the years in issue with the district director of internal revenue, Denver, Colorado. Petitioner commenced operations as an industrial bank on January 1, 1959. As part of its function as a bank, petitioner engages in the business of making loans. Petitioner's customers consist of businesses and individuals who are unable to qualify for loans from commercial banks. Their inability to qualify usually stems from a low credit rating, a poor reputation, lack of collateral or collateral that is unacceptable *238 to commercial banks. Because of the risk involved, petitioner's interest charge averages approximately 20 percent simple interest per annum. Loans made by petitioner ranged in duration from six months to five years. Approximately 42 percent of the total dollars outstanding on loans was for a term of five years. Of the loans made by petitioner half were secured by second and third mortgages on real estate and half by chattel mortgages or were unsecured. Petitioner employed a reserve for bad debts to account for defaulting obligors. For taxable years 1960 through 1967 petitioner's loans outstanding, unearned income, net amounts of loans outstanding, amount of bad debts credited against the reserve, additions to the reserve, and balance in the reserve account were as follows: 53 Reserve
Net Bad
Provision For
For Bad
Debts
Loans
Unearned
Net
Charged Off
Bad Debts (Addi-
Debts at
Year
Outstanding
Income
Loans
During the
tion to Reserve)
End of
Year
Year
1960
$ 826,225
$151,583
$ 674,642
$ 9,951
$16,079
$ 38,264
1961
1,099,518
218,647
880,871
4,598
14,854
48,520
1962
1,337,907
271,878
1,066,029
1,443
19,812
66,889
1963
1,574,464
317,997
1,256,467
14,252
30,927
[1] 57,308
1964
1,538,378
318,469
1,219,909
19,370
21,392
[1] 36,170
1965
1,529,765
314,009
1,215,756
11,608
10,532
35,094
1966
1,383,187
272,282
1,110,905
12,083
10,159
33,170
1967
1,487,529
247,949
1,239,580
15,999
18,185
35,356
*239 Petitioner's net loss on bad debts averaged 1 percent of the net loans outstanding at the end of each year for the years 1960 through 1965. The average percentage (based on a six-year computation) remained approximately the same in 1966 and 1967. Each year's actual bad debt loss constituted the following percentage of the net loans outstanding: Year
Percentage
1960
1.5
1961
.52
Year
Percentage
1962
.14
1963
1.1
1964
1.6
1965
1.0
1966
1.1
1967
1.3
During the years 1960 through 1967, the percentage of petitioner's bad debt reserve to net loans outstanding was as follows: Year End
Unearned
Balance of
Loans
Income
Net
Reserve for
Year
Outstanding
Included
Loans
Bad Dets
Percentage
1960
$ 826,225
$ 121,583
$ 674,642
$ 38,264
5.7
1961
1,099,518
218,647
880,871
48,520
5.5
1962
1,337,907
271,8 78
1,066,029
66,889
6.3
1963
1,574,464
317,997
1,256,467
57,308
4.6
1964
1,538,378
318,469
1,219,909
36,170
3.0
1965
1,529,765
314,009
1,215,756
35,094
2.9
1966
1,383,187
272,282
1,110,905
33,170
3.0
1967
1,487,529
247,949
1,239,580
35,356
2.9
*240 Respondent determined that petitioner's additions to the bad debt reserve were excessive in each of the years before us and consequently disallowed as a deduction a portion of the additions giving rise to the deficiencies in question herein. Opinion The issue to be decided is whether respondent properly disallowed a portion of petitioner's deductions for additions to its bad debt reserve. Deductions for bad debts are governed generally by section 166. [1] When employing a reserve method of accounting for bad debts the controlling language is contained in section 166(c). [2]
Pursuant to the discretion conferred on respondent by section 166(c), he promulgated Rev. Rul. 65-92, 1965-1 C.B. 112, providing guidelines to assist banks in computing additions to bad debt reserves. [3]Rev. Rul. 65-92 reads in part *241 as follows: SECTION 1. PURPOSE. The purpose of this Revenue Ruling is to provide a uniform percentage for computing annual additions to reserves for bad debts by banks in order to minimize the large differences in permissible reserves now existing among banks under prior rulings. SEC. 2. BACKGROUND. Section 166(a) of the Internal Revenue Code of 1954 allows a deduction for a debt which became worthless during the taxable year and, under certain circumstances, for a debt which is recoverable only in part and is charged off within the taxable year. Section 166(c) of the 54 Code provides that, in lieu of any deduction under section 166(a) of the Code, there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. * * * The Service has therefore approved a revised *242 special method for use by banks which is designed to minimize the existing large variances in permissible reserves. This method, which is set forth in sections 3 through 6 of this Revenue Ruling and which utilizes a uniform ratio of 2.4 percent of outstanding loans, has been approved by the Service in view of the reserve levels previously established by banks, and the special circumstances applicable to the banking industry. This method will not be used by the Service as a precedent for determining reasonable additions to reserves for bad debts by taxpayers other than banks. SEC. 3. UNIFORM RESERVE RATIO. In lieu of reserve computations made through the use of a loss experience factor determined on an individual basis as provided in section 7 of this Revenue Ruling, a bank will be allowed deductions for additions to its reserve for bad debts until the reserve equals 2.4 percent of loans outstanding at the close of the taxable year, subject to the exceptions and limitations prescribed in sections 4, 5, and 6 of this Revenue Ruling. SEC. 4. RESERVE LESS THAN UNIFORM RATIO. If the dollar balance of a bank's reserve, as of the close of its taxable year immediately preceding the *243 year of the change, is less than 2.4 percent of loans outstanding at such time, the amount of the difference (referred to herein as the deficiency in the bank's annual addition to the reserve in an amount not exceeding one-tenth of the deficiency in the reserve, commencing with the year of the change. Such amount need not be added in any specific taxable year but not more than one-tenth of the deficiency will be permitted in any one year. A bank computing its annual reserve addition under this section will also be permitted to include in such addition an amount equal to net bad debts charged to the reserve during the year. Further, it will be permitted to include in such addition 2.4 percent of the increase in its loans outstanding at the end of the taxable year over loans outstanding at the end of the year preceding the year of change, to the extent that a reserve addition with respect to such increase has not been taken in a prior year. The sum of the foregoing amounts, however, may not exceed an amount sufficient to increase the reserve to 2.4 percent of outstanding loans at the end of the taxable year. Thus, if a decrease in a bank's year-end outstanding loans has resulted in a *244 reserve ratio in excess of 2.4 percent, no addition to the reserve would be permitted for that year. If a bank changes to the reserve method of accounting, it shall be treated, for purposes of this section, as having a reserve of zero for the taxable year immediately preceding the year of the change. SEC. 5. RESERVE EXCEEDING UNIFORM RATIO. If the dollar balance of a bank's reserve, as of the close of its taxable year ending in 1964, exceeds 2.4 percent of loans outstanding at such time, the addition to the reserve in any taxable year shall not increase the reserve above the greater of (i) such dollar balance, or (ii) 2.4 percent of loans outstanding at the close of the taxable year. Thus, a bank which has reserves exceeding 2.4 percent of outstanding loans may maintain the dollar balance of its reserve by making additions to its reserve equal to the net amount of bad debts charged to the reserve during the year. Notwithstanding the preceding rules of this section, if the amount of loans outstanding at the close of the taxable year is less than the amount of loans outstanding at the close of the taxable year ending in 1964, the addition to the reserve shall not increase the reserve *245 at the close of the taxable year to a percentage of outstanding loans which is larger than the percentage which the reserve bore to outstanding loans at the close of the taxable year ending in 1964. SEC. 6. MAXIMUM ANNUAL RESERVE ADDITION. Notwithstanding the provisions of sections 4 and 5 of this ruling, the addition to the reserve that a bank will be permitted in a taxable year through the use of the uniform reserve ratio shall not exceed an amount equal to 0.8 percent of loans outstanding at the end of the taxable year, or an amount sufficient to bring the reserve to 0.8 percent of loans outstanding at the end of the taxable year, whichever amount is greater. SEC. 7. PROBABLE EXPERIENCE METHOD. In lieu of reserve computations made through the use of the uniform reserve ratio under sections 3 through 6 of this Revenue Ruling, a bank may compute its annual reserve additions under the method provided in this section. If a bank so computes its addition, it must establish, to the satisfaction of the District Director of Internal Revenue, that the amount computed is necessary in order to absorb the bad debts probably arising on loans 55 outstanding at the close of the taxable *246 year. In such event, the reasonableness of the proposed addition for the taxable year shall be determined under the provisions of section 166(c) of the Code in light of the facts existing at the close of such year. Thus, the reasonableness of the addition shall depend upon the total amount of the existing reserve and current business conditions, the nature of the bank's loans, the bank's past experience, and other factors, which may reasonably be expected to have a significant effect on the collection of the loans outstanding at the close of the taxable year. The reasonableness of the addition shall not, however, be based upon mere speculation, possibility, or contingency. For purposes of this section, the addition to the reserve for any taxable year will be regarded as reasonable if it does not increase the balance of the reserve (as of the close of such year) above an amount equal to the total amount of loans outstanding at the close of such year multiplied by the "moving average experience percentage" for such year. In determining the moving average experience percentage, reference shall be made to the bad debt experience of the bank with respect to its loans for a 6-year period *247 comprising the taxable year and the 5 preceding taxable years. The moving average percentage shall be computed as the ratio which the total amount of net bad debts sustained on loans during such 6-year period bears to the sum of the total amounts of loans outstanding at the close of each taxable year in such period. If the bank has not been in existence for the full 6-year period, then, for the portion of such period during which it was not in existence, the taxpayer may use the average bad debt experience of comparable banks with respect to comparable loans. Petitioner has employed the uniform reserve ratio method in making additions to its reserve. It has refused, however, to abide by the.8 percent limitation provided in section 6 of Rev. Rul. 65-92. Petitioner's refusal to so limit its additions to the reserve is based on a determination that average losses exceed.8 percent of loans outstanding and that an annual addition equal to only.8 percent would gradually reduce the reserve to an amount inadequate to account for potential bad debts. Petitioner further argues that to prohibit additions to reserves in excess of.8 percent is in effect to deny taxpayers with *248 loss experience in excess of that amount the use of the uniform reserve method. On this basis petitioner concludes that respondent has been arbitrary and unreasonable in disallowing deductions for its additions to reserves in excess of.8 percent of outstanding loans. Petitioner does not fully comprehend the latitude provided respondent by the express statutory grant of discretion contained in section 166(c). To be sustained petitioner must establish that respondent has abused his discretion by acting in an arbitrary or unreasonable manner. First National Bank in Olney, 44 T.C. 764 (1965), affd. 368 F. 2d 164 (C.A. 7, 1966). It is true, as petitioner asserts, that in some instances the.8 percent limitation of section 6 of Rev. Rul. 65-92 may prove to be an inadequate addition to a bad debt reserve. Recognizing this, respondent provided an alternative method of computing additions to reserves. The "Probable Experience Method" contained in section 7, Rev. Rul. 65-92, provides petitioner an avenue of computing his additions to reserve based on an average of his actual losses in prior years. We think it hardly unreasonable of respondent *249 to provide banks with exceptional loss records a separate and perfectly adequate method of making additions to their bad debt reserves. Moreover, the reasonableness of petitioner's additions to the reserve are not entirely free from doubt. As of the end of the taxable years 1965, 1966 and 1967 petitioner's bad debt reserve was 2.9 percent, 3.0 percent, and 2.9 percent, respectively, of loans outstanding. On the other hand, petitioner's actual net losses on bad debts for the same respective years amounted to 1.0 percent, 1.1 percent, and 1.3 percent of loans outstanding. In determining whether an addition to a bad debt reserve is reasonable the fundamental inquiry must be whether at the end of the year the reserve is sufficient to absorb the bad debts anticipated during the subsequent taxable year. Investors Discount Corp., 48 T.C. 767 (1967); Krim-Ko Corporation, 16 T.C. 31 (1951). Where the reserve can obviously absorb any anticipated annual loss we can only conclude that the additions to reserves made by petitioner over and above the amounts allowed by respondent are unreasonable. Decision will be entered for the respondent. 56 Footnotes
1. The parties have stipulated to the above. However, there appear to be discrepancies in the figures for the years 1963 and 1964.↩
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated. ↩
2. SEC. 166. BAD DEBTS. (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.↩
3. It is stipulated by the parties that petitioner is a bank within the scope and meaning of Rev. Rul. 65-92↩. Our reliance on the ruling is strictly for the purpose of determining the reasonableness of respondent's actions and should not be interpreted as a blanket approval of its properiety.