INVESTORS DISCOUNT CORPORATION, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 3689–65.   Filed August 29, 1967.

*H. Thompson Nicholas, Jr.,* for the petitioner.
*W. Dean Short* and *Meno W. Piliaris,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the taxable years 1962 and 1963 in the amounts of $1,257.87 and $7,272.94, respectively. The sole issue for our determination is whether petitioner made reasonable additions to its reserve for bad debts in 1961, 1962, and 1963 within the meaning of section 166(c).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is an Ohio corporation and had its principal place of business in Cincinnati, Ohio, at the time of filing the petition herein.

Petitioner filed its income tax returns for the calendar years ended December 31, 1961, December 31, 1962, and December 31, 1963, with the district director of internal revenue, Cincinnati, Ohio.

The stock of petitioner is wholly owned by Robert L. Siegel, Inc. (hereafter referred to as Siegel, Inc.), an Ohio corporation. The principal business activity of Siegel, Inc., is that of a real estate dealer in multifamily dwellings. Its stock is wholly owned by Robert L. Siegel.

Franco, Inc., is an Ohio corporation. Its principal business activity is that of a real estate dealer in single-family dwellings. Its stock is also wholly owned by Robert L. Siegel.

Siegel, Inc., and Franco, Inc., deal in marginal real estate, i.e., older type homes that were purchased and resold to individuals who were dislocated due to the urban renewal program taking place in the West End of Cincinnati.

When a sale was made by Siegel, Inc., or Franco, Inc., a first mortgage was obtained for the purchaser from a financial institution, usually a building and loan association, and a second mortgage was executed by the purchaser made payable to the seller, Siegel, Inc., or

---

[1] All statutory references are to the Internal Revenue Code of 1954.

The reserve deduction for 1961 is at issue because it affects petitioner's net operating loss for that year and the extent of the carry-forward affects the deficiencies asserted for 1962 and 1963.

Franco, Inc. The first mortgage loan, the proceeds of which represented the downpayment to the seller, was generally not sufficient to cover acquisition costs, so that the profit was represented by the second mortgage.

Prior to the organization of petitioner, Siegel, Inc., and Franco, Inc., sold their second mortgages and other debt obligations to Arlington Discount Co. Arlington represented the only means that Siegel, Inc., or Franco, Inc., had for disposing of such debt obligations. The price paid by Arlington for a debt obligation was from 40 to 60 percent of face. The arrangement Siegel, Inc., and Franco, Inc., had with Arlington was terminated in the summer or early fall of 1961 because Arlington had become more selective in the debt obligations it would purchase and, along with the increased selectivity, it also raised the discount rate. The reason given for raising the discount rate was the unfavorable collection experience of Arlington with respect to the debt obligations thus purchased. Siegel, Inc., and Franco, Inc., determined that they could no longer absorb the high discount rate and operate at a profit. Because of the termination of business relations with Arlington, petitioner was organized in order that Siegel, Inc., and Franco, Inc., could market the debt obligations previously sold to Arlington. To supplement the initial capitalization of $65,000, petitioner made application with the Division of Securities, State of Ohio, to sell registered certificates of indebtedness as a source for funds to purchase these debt obligations.

On November 22, 1961, petitioner and Siegel, Inc., entered into an agreement with respect to petitioner's purchase of the debt obligations from Siegel, Inc., as follows:

## GUARANTEE

This agreement entered into at Cincinnati, Ohio, this 22nd day of November, 1961, by and between INVESTORS DISCOUNT CORPORATION and ROBERT L. SIEGEL, INC. wherein it is mutually agreed as follows:

WHEREAS, INVESTORS DISCOUNT CORPORATION may from time to time in the future purchase certain notes secured by mortgages at a discount to be agreed upon between the parties from ROBERT L. SIEGEL, INC.,

Now, THEREFORE, in consideration of the purchase of said notes and mortgages by [INVESTORS DISCOUNT CORPORATION [2]], it is hereby stipulated and agreed that ROBERT L. SIEGEL, INC. guarantees to INVESTORS DISCOUNT CORPORATION in case of default of payment on the notes and mortgages purchased as aforesaid. The said ROBERT L. SIEGEL, INC. will be liable for the full amount of the debt, interest and costs, including attorneys fees if foreclosure becomes necessary.

IT IS FURTHER AGREED, That INVESTORS DISCOUNT CORPORATION in calling upon ROBERT L. SIEGEL, INC. in the exercise of this guarantee will reassign to ROBERT L. SIEGEL, INC. the notes and mortgages aforesaid.

[2] The original guarantee erroneously substituted Robert L. Siegel, Inc., for Investors Discount Corp.

THIS GUARANTEE shall continue in full force and effect until terminated by notice in writing to INVESTORS DISCOUNT CORPORATION.

INVESTORS DISCOUNT CORPORATION

By: (S) ROBERT L. SIEGEL, *Pres.*

ROBERT L. SIEGEL, INC.

By: (S) ROBERT L. SIEGEL, *Pres.*

An identical agreement was also entered into between petitioner and Franco, Inc., on November 22, 1961.

The reason Siegel, Inc., and Franco, Inc., entered into the agreements with petitioner was that it was known that petitioner would periodically be subject to audit by the Division of Securities of the State of Ohio and it was felt that such agreements would help petitioner as a newly formed corporation grow in strength, especially since petitioner was to be dealing, and did in fact deal, with public funds.

Franco, Inc., notified petitioner, in a letter dated July 31, 1964, and signed by Robert L. Siegel, of the termination of its agreement.

By letter signed by Robert L. Siegel and dated December 31, 1964, in the identical language of that used by Franco, Inc., Siegel, Inc., notified petitioner of the termination of its agreement.

The debt obligations purchased by petitioner from Siegel, Inc., and Franco, Inc., generally ran for a period of 10 years to over 20 years. The bulk of the debt obligations sold by Siegel, Inc., and Franco, Inc., to petitioner were discounted to the extent of approximately 40 percent of face value.

All debt obligations acquired by petitioner from Siegel, Inc., and Franco, Inc., on which payment was defaulted during the years 1961, 1962, and 1963 were reassigned to Siegel, Inc., and Franco, Inc., in accordance with the terms of the agreements.

From the date of petitioner's incorporation to the date of the termination of the agreements by Franco, Inc., and Siegel, Inc., on July 31, 1964, and December 31, 1964, respectively, petitioner had purchased from Franco, Inc., and Siegel, Inc., various second mortgages, land contracts, and "collateral accounts" with an aggregate face value at the time of acquisition of $1,224,544.29. Out of these, debt obligations with a face value of $255,860.45 were reassigned to Siegel, Inc., and Franco, Inc., in accordance with the agreements. Out of the foregoing reacquired debt obligations of $255,860.45, Siegel, Inc., and Franco, Inc., claimed the following bad debt losses which they deducted for tax purposes under a specific chargeoff method:

| Year | Franco, Inc | Siegel, Inc. |
|---|---|---|
| 1962 | $1, 715. 95 | $8, 449. 33 |
| 1963 | 17, 745. 46 | 69, 539. 80 |
| 1964 | 12, 809. 03 | 40, 736. 16 |
| Total | 32, 270. 44 | 118, 725. 29 |

The percentage of total combined *claimed* losses of Siegel, Inc., and Franco, Inc., as aforesaid, when related to the sum of the unrecovered cost of the debt obligations of petitioner and the actual losses of Siegel, Inc., and Franco, Inc., as of the end of each year in question, are as follows: 1961, 0 percent, 1962, 4.6 percent, and 1963, 18.5 percent.

The only debt obligations purchased by petitioner during these years from persons other than Siegel, Inc., and Franco, Inc., had amounts due of $16,045.96 in the aggregate at the dates of acquisition. All of these were represented by second mortgages or "collateral accounts."

The following represents the unrecovered face value and unrecovered cost of acquisition of the debt obligations owned by petitioner at the dates indicated:

|  | Unrecovered face value | Unearned discount | Unrecovered cost |
|---|---|---|---|
| As at Dec. 31, 1961: | | | |
| Second mortgages | $80,249.49 | $32,099.80 | $48,149.69 |
| Collateral accounts | 15,547.89 | | 15,547.89 |
| | 95,797.38 | 32,099.80 | 63,697.58 |
| As at Dec. 31, 1962: | | | |
| Second mortgages | 320,477.50 | 128,254.37 | 192,223.13 |
| Collateral accounts | 15,619.97 | | 15,619.97 |
| | 336,097.47 | 128,254.37 | 207,843.10 |
| As at Dec. 31, 1963: | | | |
| Second mortgages | 605,909.53 | 278,415.11 | 327,494.42 |
| Collateral accounts | 83,017.13 | 26,935.50 | 56,081.63 |
| | 688,926.66 | 305,350.61 | 383,576.05 |

Petitioner elected to use the reserve method of accounting for bad debts on its initial return for the taxable year 1961.

During the years 1961, 1962, and 1963, petitioner determined the addition to its bad debt reserve which it deducted on its income tax returns, as indicated by the following tabulation:

| Year | Receivables at year's end | Addition to the reserve | Charges against reserve | Reserve balance at year's end (5 percent of receivables) |
|---|---|---|---|---|
| 1961 | $95,797.38 | $4,789.87 | | $4,789.87 |
| 1962 | 336,097.47 | 12,015.00 | | 16,804.87 |
| 1963 | 688,926.66 | 18,546.79 | $905.33 | 34,446.33 |

Respondent disallowed the following amounts of the additions to the reserve: [3] 1961, $4,721.50, 1962, $11,820.90, 1963, $17,356.48.

On its 1964 and 1965 income tax returns, petitioner deducted as charges against its bad debt reserves the sums of $3,964.03 and $29,991.12, respectively.

[3] The apparent discrepancy between the amounts allowed by respondent and the charges against the reserve representing actual bad debt losses of petitioner is not explained except with respect to $905.33 in 1963 representing the unrecovered cost of an obligation acquired from one Henry B. Bunker.

OPINION

The sole issue herein involves respondent's disallowance of the major portion of petitioner's additions to its reserve for bad debts under section 166.[4]

The main dispute between the parties revolves around the effect to be given to the agreements between petitioner and Siegel, Inc., and Franco, Inc.[5] Petitioner strenuously insists that, by terminating these agreements, Siegel, Inc., and Franco, Inc., could relieve themselves of any subsequent responsibility with respect to debt obligations previously acquired from them by petitioner. Respondent, with equal intensity, argues that a proper interpretation of the termination clauses requires us to hold that Siegel, Inc., and Franco, Inc., would, nevertheless, continue to be responsible for repurchasing any such previously acquired debt obligations with respect to which the debtor might thereafter default.[6] In large measure, the parties have misdirected their fire. Assuming without deciding that petitioner's contention as to the import of the agreements is correct, there is a fatal flaw in its position.

The essential question to be determined in establishing an addition to a bad debt reserve is whether, looking at the factual situation as it exists at the end of the taxable year, the reserve is sufficient to absorb the bad debts that are anticipated during the subsequent taxable year. *Krim-Ko Corporation*, 16 T.C. 31 (1951). The fact that feared contingencies may arise in a later period, although possibly justifying an accumulation of surplus from the viewpoint of sound business management, does not justify the type of reserve contemplated by section 166. *S. W. Coe & Co. v. Dallman*, 216 F. 2d 566 (C.A. 7, 1954); *Citrus Motors Ontario, Inc. v. United States*, 249 F. Supp. 425 (S.D. Cal. 1965); *Financial Credit Corporation v. United States*, 205 F. Supp. 274 (D. Idaho 1962); *American State Bank v. United States*, 176 F.

---

[4] SEC. 166. BAD DEBTS.
  (a) GENERAL RULE.—
    (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

\*    \*    \*    \*    \*    \*    \*

  (c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

[5] The "Guarantee" designation on these agreements is really a misnomer. In point of fact, they involved an undertaking by Siegel, Inc., and Franco, Inc., to repurchase defaulted debt obligations sold by them to petitioner rather than a guarantee of payment of those obligations.

[6] Originally, the parties assumed that the proper base for computing the bad debt reserve was the *unrecovered face value* of the debt obligations at the end of each taxable year. In responding to the Court's request for a supplemental stipulation of facts and supplemental briefs on this point, petitioner has conceded, as well it should, that the proper base is the *unrecovered cost*. *Estate of Maurice S. Saltstein*, 46 B.T.A. 774 (1942); *Wilbur Glenn Voliva*, 10 B.T.A. 911 (1928), affd. 36 F. 2d 212 (C.A. 7, 1929); cf. I.T. 3957, 1949–1 C.B. 65; 5 Mertens, Law of Federal Income Taxation, secs. 30.12, 30.69, 30.74, and 30.76 (Zimet & Ness rev.).

Supp. 64 (E.D. Wisc. 1959), affd. 279 F. 2d 585 (C.A. 7, 1960) ; *Krim-Ko Corporation*, *supra;* cf. *Roanoke Vending Exchange, Inc.*, 40 T.C. 735 (1963). Indeed, the manner in which the amount of the deduction is calculated reveals that the anticipated losses for the following year is the focal point of inquiry. The amount in the reserve is reexamined *annually* in order to determine the amount of the addition required.

In this context, petitioner's position is untenable. The fact of the matter is that the repurchase undertakings were in effect and were scrupulously honored by Siegel, Inc., and Franco, Inc., during the entire period before us. It may well be that, under circumstances such as are involved herein, the possibility that Siegel, Inc., and Franco, Inc., might terminate the arrangements, or otherwise be unwilling or unable to honor their undertakings, during that period is a factor to be taken into account in determining the proper amount of petitioner's bad debt reserve. Cf. *Southeastern Finance Co.*, 4 T.C. 1069 (1945) (issue 3 at 1088), affd. 153 F. 2d 205 (C.A. 5, 1946) ; compare *Mill Factors Corporation*, 14 T.C. 1366 (1950), where the findings of fact reveal that the debt obligations involved had been purchased without recourse. But the only testimony on this score was the general statement of petitioner's sole witness—the accountant, treasurer, and member of the board of directors of petitioner, Siegel, Inc., and Franco, Inc.— that "we had hoped * * * that at the end of two years, Investors Discount Corporation would be able to stand on its own." This uncorroborated testimony is totally insufficient, especially in light of the fact that the undertakings were not actually terminated until July 31, 1964, in the case of Franco, Inc., and December 31, 1964, in the case of Siegel, Inc. In any event, even if we took this testimony at face value, it could not help petitioner for the taxable years 1961 and 1962, since the 2-year period would not expire until November 1963.[7]

The simple, unadulterated fact is that, on this record, petitioner had no reason to expect that it would not have the full protection of the umbrella of the repurchase undertakings of Siegel, Inc., and Franco, Inc., during the taxable years 1961, 1962, and 1963. As the Supreme Court said in a different but comparable context in *Putnam* v. *Commissioner*, 352 U.S. 82 (1956), at page 89, "The reality of the situation is that the debt is *an asset of full value* in the creditor's hands because backed by the guaranty." (Emphasis added.)

A greater than usual burden is imposed upon a taxpayer in overcoming the respondent's determination that an addition to its reserve

---

[7] Even if we were to hold that the petitioner has proved that Franco, Inc., could have been expected to terminate this undertaking before the end of 1964, we have no way, on the basis of the record herein, of determining what effect should be given thereto. Looking at the situation at the end of 1963, we cannot tell when in 1964 this event might have been expected to occur, nor have we been apprised of the unrecovered cost as of Dec. 31, 1963, of the debt obligations purchased by petitioner from Franco, Inc., and still held by it on that date.

for bad debts is improper. See, e.g., *Roanoke Vending Exchange, Inc.*, *supra*, and cases collected in 5 Mertens, Law of Federal Income Taxation, sec. 30.74, fn. 60 (Zimet & Ness rev.). Petitioner has utterly failed to meet that burden.[8]

*Decision will be entered for the respondent.*

---

[8] Conceivably, petitioner might be entitled to a bad debt reserve with respect to debt obligations purchased from persons other than Siegel, Inc., and Franco, Inc. These obligations represented amounts due of $16,045.96 in the aggregate at the dates of acquisition. But, the record furnishes no basis for determining the unrecovered cost of these obligations at the end of each taxable year. See fn. 6, *supra*. Moreover, we have been furnished no evidence as to the expected loss standard which might be applied to these obligations. In this connection, we note that all of these debt obligations were secured—a factor not without significance. We note also that, although respondent appears, for the purposes of argument, not to have contested the reasonableness of the additions to petitioner's bad debt reserve, aside from the effect of the repurchase undertakings, he did not concede that the *claimed* loss experience of petitioner, Siegel, Inc., and Franco, Inc., accorded with the *actual* loss experience, as to which there was no proof. In any event, subsequent loss experience is at most merely corroborative of the validity of a bad debt reserve established in accordance with recognized standards and cannot be a substitute for these standards. *Farmville Oil & Fertilizer Co.* v. *Commissioner*, 78 F. 2d 83 (C.A. 4, 1935), affirming 30 B.T.A. 1048 (1934) ; *Art Metal Const. Co.* v. *United States*, 17 F. Supp. 854 (Ct. Cl. 1937) ; *Roanoke Vending Exchange, Inc.*, 40 T.C. 735. Moreover, all of the debt obligations acquired by petitioner from Siegel, Inc., and Franco, Inc., were also secured, for the most part, by second mortgages. The mere fact that the second mortgages generally represented the entire profit from the underlying transaction is not proof that the security should not be taken into account in determining the collectibility of the debt obligations. Cf. *Wingate E. Underhill*, 45 T.C. 489 (1966).