## Massachusetts Business Development Corporation, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 6349–66.   Filed September 11, 1969.

*Roger P. Stokey* and *William H. Gorham*, for the petitioner.
*Robert B. Dugan*, for the respondent.

950

**OPINION**

RAUM, *Judge:* This case involves the disallowance of petitioner's deductions for additions to its bad debt reserve for each of the years 1961–64. An understanding of the background and general scope of the applicable statutory provisions is important to the proper application of those provisions to the facts before us.

Ordinarily, our tax laws do not allow any deductions in respect of reserves; it is only when losses actually occur that deductions therefor may be taken. *Brown* v. *Helvering*, 291 U.S. 193. And as pointed out in *Krim-Ko Corporation*, 16 T.C. 31, 37, this was at one time true as to bad debts. However, beginning with the Revenue Act of 1921, a taxpayer was given a choice to deduct either specific bad debts which became worthless during the taxable year or, in the discretion of the

Commissioner, a reasonable addition to a bad debt reserve. The deduction for specific worthless debts is now contained in section 166(a) of the 1954 Code, and the alternative deduction in respect of a reserve for bad debts is set forth in section 166(c) which provides as follows:

SEC. 166. BAD DEBTS.

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

It should be noted, however, that the taxpayer is not given an absolute right to such alternative deduction, which Congress explicitly made contingent upon the Commissioner's discretion; and where the Commissioner has disapproved the claimed deduction, the pivotal question to be considered is whether he has abused that discretion. See *Krim-Ko Corporation*, 16 T.C. at 37. Thus, where a deduction sought under section 166(c) is disallowed, the taxpayer must carry a particularly heavy burden to show not only the reasonableness of the claimed addition to the reserve but also an abuse of discretion by the Commissioner. As was stated in *Roanoke Vending Exchange, Inc.*, 40 T.C. 735, 741:

Respondent's determination with respect to additions to a reserve for bad debts carries a great deal of weight because of the discretion vested in him under section 166(c) of the 1954 Code and, accordingly, the burden of proof on a taxpayer regarding the respondent's determinations is greater than the usual burden which faces the taxpayer who seeks to overcome the presumption of correctness which attaches to respondent's ordinary notice of deficiency. * * * Thus, the petitioner must not only demonstrate that its additions to the reserve were reasonable, but, also that respondent's action in disallowing those additions for the years in question were arbitrary, and amounted to an abuse of his discretion. * * *

Similar thoughts have been expressed on numerous occasions. See, e.g., *United States* v. *Haskel Engineering & Supply Co.*, 380 F. 2d 786, 789 (C.A. 9); *Ehlen* v. *United States*, 323 F. 2d 535, 539, 540 (Ct. Cl.); *Paramount Finance Co.* v. *United States*, 304 F. 2d 460, 464 (Ct. Cl.); *American State Bank* v. *United States*, 279 F. 2d 585, 590 (C.A. 7); *S. W. Coe & Co.* v. *Dallman*, 216 F. 2d 566, 570 (C.A. 7); *First National Bank in Olney*, 44 T.C. 764, 770–771, affirmed 368 F. 2d 164 (C.A. 7); *R. Gsell & Co., Inc.*, 34 T.C. 41, 56, reversed on other grounds 294 F. 2d 321 (C.A. 2).

In our judgment, petitioner has not carried that heavy burden here. Although it has presented evidence calculated to establish the reasonableness of its disputed additions to its reserve, the record at the same time fails to demonstrate that the Commissioner's determination was an abuse of discretion or was otherwise arbitrary. Cf. *United States* v. *Haskel Engineering & Supply Co.*, 380 F. 2d at 789; *Ehlen* v. *United States*, 323 F. 2d at 539, 540; *Paramount Finance Co.* v. *United States*,

304 F. 2d at 464. To the contrary, the history of petitioner's actual bad debt experience during 1954–64, a continuous period of 11 years, represents affirmative evidence in support of the Commissioner's position and certainly refutes any charge of arbitrariness that might be made against him. For, "where the taxpayer's reserve appears to be unreasonably large in relation to its actual bad debt experience, additions to it could properly be disallowed and the Commissioner would not be abusing his statutory discretion." *Ehlen* v. *United States*, 323 F. 2d at 540.

At the outset, it must be remembered that an addition to a reserve for bad debts represents merely an estimate of losses that can be expected to be sustained in the future that are attributable to current transactions. *Ehlen* v. *United States*, 323 F. 2d at 542; *R. Gsell & Co., Inc.*, 34 T.C. at 56. And in determining the reasonableness of an addition to the reserve the crux of the matter is whether the entire balance in the reserve, not merely the addition thereto, will be sufficient to absorb the expected future losses from bad debts; for, "If the reserve is already adequate to cover the accounts receivable which reasonably can be expected to become worthless, no deduction for an addition to the reserve is allowable for the taxable year." *Roanoke Vending Exchange, Inc.*, 40 T.C. at 740; see also *Patterson* v. *Pizitz, Inc.*, 353 F. 2d 267, 268–269 (C.A. 5), certiorari denied 383 U.S. 910; *Krim-Ko Corporation*, 16 T.C. at 37. Moreover, the reserve, for tax purposes, is not intended to be a reserve against mere contingencies. While from the viewpoint of sound business management it may be justifiable to establish a reserve for feared future contingencies—for example, to protect against excessive losses in future depression years—such a reserve is not the type contemplated by section 166. *American State Bank* v. *United States*, 279 F. 2d at 588, 589; *S. W. Coe & Co.* v. *Dallman*, 216 F. 2d at 569–570; *Financial Credit Corp.* v. *United States*, 205 F. Supp. 274, 277 (D. Idaho); *Investors Discount Corp.*, 48 T.C. 767, 771.

Applying these principles here, we cannot find any abuse of discretion by the Commissioner, notwithstanding various considerations urged upon us by petitioner as noted hereinafter.

The Commissioner's position is based primarily on the disparity between petitioner's reserves and its actual losses. At the end of 1960, petitioner had a bad debt reserve of $293,991, or 5.48 percent of its outstanding receivables at the end of that year. By denying deductions for further additions to the reserve for the years in issue (1961–64), the Commissioner in effect limited the petitioner's bad debt reserve to $293,991 for all those years. In the table below the ratios of the reserve to receivables resulting from the Commissioner's determination are

compared to the ratios resulting from the additions to the reserve claimed by petitioner:

| Year | Petitioner's claims | Commissioner's determination |
|---|---|---|
| | Percent | Percent |
| 1961 | 6. 49 | 5. 30 |
| 1962 | 6. 91 | 4. 80 |
| 1963 | 7. 97 | 4. 67 |
| 1964 | 8. 97 | 4. 41 |

Petitioner's sole loss experience, however, occurred in 1961 when $22,848 was charged against the bad debt reserve. In the following year, half of this amount was recovered, and in 1964 a further $383 was credited to the reserve; the net loss, from 1954 through 1964, was thus $11,041. This loss experience can be expressed as a percentage in various ways. First, considering petitioner's 11-year experience as a whole, through the end of 1964 petitioner had made 283 loans aggregating $34,812,000. Of these 283 loans, 193 had been fully repaid, and of $34,812,000 in loans, at least $28,398,245, or 81.58 percent, had been repaid; at most, $6,402,714,[2] or 18.39 percent was outstanding, and losses for bad debts in the aggregate net amount of only $11,041, or 0.0317 percent, had in fact been incurred and written off. Second, the ratio of total losses to the sum of the outstanding receivables at the close of each year was 0.0224 percent. Third, the average annual ratio of losses to outstanding receivables at the close of each year was 0.0225 percent. Thus, by even the most generous standard, the ratio of petitioner's bad debt reserve to outstanding receivables at the close of 1964 stood at some 283 times petitioner's loss experience. Indeed, the amount of the reserve was some 52 times greater than petitioner's total losses from bad debts over an 11-year period.

Petitioner seeks to minimize this disparity in several ways. First, it emphasizes the general nature of the loans made, pointing out that they are made only to borrowers who cannot obtain financing from conventional sources. Further, the loans are made on terms that would not be given to even good customers by ordinary lenders: the loans have "long" terms, comparatively low interest, and less than high-grade security. There are also a relatively small number of large loans. Finally, the borrowers, when they become good credit risks, are encouraged to refinance with a loan from a conventional lender, with the result that the funds will be reloaned by petitioner to a poor credit risk. There can be no doubt that, had petitioner no experience, this general plan of lending could reasonably be expected to result in substantial bad debt losses and would justify a relatively large bad debt reserve. In fact, in the light of petitioner's lending practices as

---

[2] It is not clear from the record whether this figure includes some accrued interest.

described above it can hardly be expected that its loss experience in the future will remain negligible, as it has so far. However, the evidence suggests that petitioner exercised considerable care and good judgment in making these so-called high-risk loans, and this fact not only may account in substantial part for its favorable experience up to the end of 1964, but also may play an important role in reducing what might otherwise be expectable future losses. Moreover, there was no evidence presented concerning losses during the years between 1964 and the time of trial. Cf. *Financial Credit Corporation* v. *United States*, 205 F. Supp. at 277. While additions to the reserve must of course be made in the light of conditions existing at that time, subsequent loss experience may properly be considered as additional evidence tending to confirm the reasonableness of the taxpayer's method of computing additions to the reserve. *Roanoke Vending Exchange, Inc.*, 40 T.C. at 741; *Ehlen* v. *United States*, 323 F. 2d at 539–540 (Ct. Cl.). Thus, in this state of the record, we cannot find that petitioner's experience even after 1964 has borne out the need for anything like the size of the reserve existing at the close of that year. Accordingly, we cannot say that the Commissioner was arbitrary in his denial of deductions for additions to the reserve for the years at issue. While we may consider petitioner's low rate of loss unusual in view of the type of loans made, even the Commissioner's determination leaves at the close of 1964 a bad debt reserve of 4.41 percent of receivables, an amount still far in excess of that called for by petitioner's experience.[8]

Petitioner next points out that it has existed thus far in a period of unprecedented economic prosperity, stating that between 1958 and 1965 the gross national product declined only once in two successive quarters. It further argues that, in establishing a bad debt reserve, no one could reasonably foresee a continuation of such prosperity. If there were an economic downturn, petitioner continues, it would suffer drastic losses before conventional lenders because of the poor credit risks of its debtors and the inferior security for its loans. It also appears that if bad debt losses exceeded the reserve, they would

---

[8] Moreover, even if petitioner should sustain bad debt losses in a later year in excess of what can be absorbed by the reserve, it would not necessarily be disadvantaged thereby, for such excess would be taken into account in determining the addition to the reserve in the later year. See sec. 1.166–4(b) (2), Income Tax Regs., which provides:

Secs. 1.166–4 Reserve for bad debts.

(b) *Reasonableness of addition to reserve*—, * * *

(2) *Correction of errors in prior estimates.* In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.

Thus, petitioner will have the advantage of a deduction for such losses in the year in which they in fact occur, and, if they should result in a net operating loss for that year, such loss may be carried back or forward under the provisions of sec. 172.

first be charged against earned surplus (which for the years in issue was not large) and then against capital. Since petitioner's own borrowing capacity is dependent on the size of its capital account, any impairment of capital would severely limit its potential lending activities, particularly in light of the high leverage involved.[4] For these reasons petitioner argues that its reserves were reasonable and that the Commissioner's disallowance was arbitrary. We disagree.

A reserve of the magnitude which petitioner seeks to justify in this respect is nothing more than a contingency reserve against excessive losses in possible future depression years—a type of reserve that might be justified by sound business reasons but not one that is within the contemplation of section 166(c). See cases, *supra* p. 952. There is no showing that any such losses occurred during the period of approximately 15 years beginning with 1954, and it seems clear that the Commissioner's action in the circumstances can hardly be characterized as unreasonable or arbitrary.[5] Cf. *Patterson* v. *Pizitz, Inc.*, 353 F. 2d at 270.

Petitioner's next argument focuses on particular loans outstanding at the end of 1964 which it claims are presently in such state as to warrant the contested additions to the reserve. It relies on the testimony of two of its former executive vice presidents, Francis P. Brennan (1954–61) and Robert Elliott (1961–68). Brennan is presently on its board of directors. Their testimony was concerned with 7 loans (to six borrowers) that were outstanding at the close of 1964 and were still outstanding at the time of trial; the testimony related to the condition of those loans as of the time of trial in October 1968, not as of the close

---

[4] It must be noted, however, that petitioner's borrowing during the years in question never reached 8 times capital, the limit provided in the charter during those years. At the end of 1964, borrowings were about 6.7 times capital.

[5] Indeed, in sec. 441(a) of H.R. 13270, passed by the House of Representatives, Aug. 7, 1969, a new provision (sec. 585) is added to the 1954 Code relating to additions to bad debt reserves by banks, small business investment companies, and business development corporations. In general, the new provision would permit such institutions in the future to add to their bad debt reserves only such amounts as would be called for on the basis of their own bad debt loss experience for the current year and the 5 preceding years. See H. Rept. No. 91–413 (Part 1), 91st Cong., 1st Sess., pp. 120–121. Of course, this new provision, even if finally enacted, would have prospective effect only, as presently drafted. But it is significant as an expression of the views of at least the House of Representatives as to what is a "reasonable" addition to a bad debt reserve, and thus has some bearing upon whether the Commissioner's action was arbitrary or unreasonable in disapproving additions to petitioner's reserve. In spelling out the need for the new provisions the House Ways and Means Committee, in the above report, noted that the existing administrative practice in respect of commercial banks permitted additions to their bad debt reserves based upon 2.4 percent of outstanding uninsured loans, a figure that is "roughly three times the annual bad-debt loss of commercial banks during the period 1928–47," and that the extent of such "favored tax treatment granted to commercial banks * * * is shown by the fact that if banks were subject to the same bad-debt reserve rules applying to taxpayers generally, they would on the average be allowed to build up a bad-debt reserve of less than 0.2 percent of outstanding noninsured loans." The new provision, based on a 6-year moving average, was made applicable to small business investment companies and business development corporations in order to "provide comparable treatment."

of any of the taxable years 1961–64. There were 90 loans in all out-standing at the end of 1964, and 51 of them had since been fully paid off, leaving 39 still outstanding. There was no suggestion as to any infirmities with respect to 32 of those 39. The remaining 7 were as follows:

| | When made | Original amount | Unpaid balance at time of trial [1] |
|---|---|---|---|
| Thunder Mountain Skiing Inc | 8/10/62 | $125,000 | $99,786 |
| Thunder Mountain Skiing Inc | 8/26/63 | 85,000 | 85,000 |
| Crook Realty Trust | 4/29/60 | 63,000 | 26,756 |
| Telmwood Realty Trust | 11/24/64 | 300,000 | 198,704 |
| Educator Biscuit Co., Inc | 8/20/64 | 400,000 | 400,000 |
| Stern Realty Trust | 10/30/64 | 425,000 | 150,513 |
| Royal Curtain—Fairclough & Gold, Inc | 7/17/64 | 200,000 | 132,930 |
| Totals | | 1,598,000 | 1,093,689 |

[1] Such balance was not necessarily payable at that time. For example, no part of the $400,000 Educator Biscuit loan had matured.

It must be kept in mind that the reasonableness of an addition to a bad debt reserve must be judged in the light of conditions as they existed at the close of the taxable year, see *Roanoke Vending Exchange, Inc.*, 40 T.C. at 741; *Carithers-Wallace-Courtenay*, 5 T.C. 942, 945; *Paramount Finance Co.* v. *United States*, 304 F. 2d 460, 464 (Ct. Cl.), and therefore the testimony of Elliott and Brennan which reflected conditions some years later has only limited relevance. Moreover, we must take into account the stipulation of the parties that at the close of 1964 only 1 loan out of the 90 then outstanding was delinquent, and that such delinquency totaled $12,000 while the entire balance due on that loan was $203,000. The record does not identify the specific loan thus referred to nor does it show whether it was one of the 7 listed above. We nevertheless have considered the testimony as to those 7 loans and have attempted to give it some weight.

The security for the two Thunder Mountain loans consisted of an assignment of a leasehold interest in ski trails and a mortgage on ski-lift equipment. There was no evidence as to the terms of payment of these loans, but the testimony was that at the time of trial they were both entirely past due in respect of principal. With respect to the Crook Realty loan, Elliott first testified that he did not know whether it was delinquent. He later stated that an informal agreement with Crook had been made but was not working out, so that he regarded the loan as past due in its entirety. Nevertheless, the loan appeared to be adequately secured by a first mortgage, and Elliott finally stated that he did not anticipate a loss on the loan.

With respect to the Telmwood Realty loan, Elliott stated, "Telmwood Realty I believe to be past due in terms of principal and interest—I'm sorry, I cannot tell you the exact extent of Telmwood, of that

$300,000." He later testified that, while the loan had not yet matured, the debtor was, at the time of Elliott's departure from MBDC, several months in default in its periodic payments. The security for the loan was a second mortgage on an "old mill property." The loan to Educator Biscuit was only in technical default by virtue of an impairment of capital that violated the loan agreement. Interest payments were current, and no payments on principal were yet due, as the loan had been made in conjunction with a bank loan, which was to be paid off first. Payments to the bank were current. Elliott also testified that the Stern Realty and Royal Curtain loans were delinquent, but gave no further explanation concerning these loans.

We do not find the testimony concerning these loans as of October 1968 specific enough to satisfy us that the Commissioner abused his discretion as of the end of each of the taxable years 1961, 1962, 1963, and 1964. Only the Thunder Mountain loans appear to have been in serious difficulty, and we have no way of knowing how much could be salvaged even in respect of those loans if they should ultimately become uncollectible. Testimony as to the other defaults was for the most part vague, and what there was does not demonstrate a pattern of serious delinquency. Further, it must be remembered that the Commissioner's determination does allow petitioner a substantial bad debt reserve of nearly $300,000, and we cannot find that it was so low as to be unreasonable even in light of the doubtfulness of the specific loans discussed above.

Both Brennan and Elliott testified that in their opinions petitioner would be fully justified in establishing a bad debt reserve equal to 10 percent of its outstanding loans. While we do not doubt the experience and competence of the witnesses, their opinions appear to have been based largely [6] on a consideration of the type of loans petitioner made, a factor which we have discussed above and to which we give less weight in light of petitioner's actual loss experience. No evidence was introduced as to the loss experience of other business development corporations, which carry on like activities in some 15 other States. We think that the witnesses' 10-percent reserve opinions were really opinions regarding something like a contingency reserve, which is not the same as the section 166 (c) bad debt reserve See p. 952, *supra*.

Petitioner's final point is that certain financial institutions that make less risky loans than does petitioner are allowed by statute or administrative decision a larger bad debt reserve ratio than the Commissioner has allowed in this case. Petitioner calls our attention to

[6] It seems likely that the witnesses also took into account the reserves which had theretofore been approved for commercial banks and other financial institutions. However, such reserves appear to have been highly inflated, see fn. 5, *supra*, and fn. 7, *infra*, and they do not establish that the Commissioner acted arbitrarily in determining what is a "reasonable" addition to petitioner's reserve, which, after all, must stand on its own feet.

the case of Small Business Investment Corporations (SBIC) in particular. Rev. Rul. 64–48, 1964–1 C.B. (Part 1) 104, provided that such corporations could for 10 years use a 10-percent ratio of bad debt reserves to receivables. Rev. Rul. 65–88, 1965–1 C.B. 112, explained that 10 percent was not meant as a maximum figure should circumstances warrant a higher one. Rev. Rul. 64–48 further provided that after 10 years, actual experience would be used to determine the proper size of the reserve, and stated:

> The ten-percent ceiling was arrived at after a thorough study of the nature of the SBIC industry and the inherent risks involved in the type of loans made. The increasing amount of charge-offs under current business trends and a comparison of the principal features of the SBIC industry with those of other types of lending institutions were other factors considered. [1964–1 C.B. (Part 1) at 104–105.]

Petitioner argues that its business is more risky than that of an SBIC and thus that its reserve ratio should be at least as high. The ratio for SBICs, however, was only temporary and was to be replaced by one derived from experience. Petitioner has had experience, and its losses have been practically nil. We cannot approach this case in the kind of practical vacuum (as though there were no loss experience) that faced the authors of Rev. Rul. 64–48. Moreover, petitioner failed to introduce evidence as to the loss experience of other business development corporations, so that we have only its own experience with which to work.

Petitioner also calls our attention to the bad debt reserves prescribed under section 593 of the Code for mutual savings banks, domestic building and loan associations, and cooperative banks. Until the Revenue Act of 1951, such organizations were exempt from Federal income tax. In section 313(e) of that Act, section 23(k)(1) of the 1939 Code was amended to provide for a deduction for additions to the bad debt reserves of these institutions in whatever amount the institution should determine, but not greater than the lesser of the total amount of its net income or the amount by which 12 percent of its deposits exceeds the sum of its surplus, undivided profits, and reserves. This provision was carried over into section 593 of the 1954 Code. In the Revenue Act of 1962, however, section 593 was extensively amended and now provides a highly complex method of computing additions to bad debt reserves. The general purpose, however, was to reduce the allowable deductions for the additions. The House report states:

> Your committee has reviewed the tax treatment of the mutual savings institutions. It has concluded that the present bad-debt reserve provisions are unduly generous and that they require revision. Accordingly, your committee's bill amends the special bad-debt reserve provisions of existing law which are applicable to these institutions to provide what it believes will be an assurance that

significant tax will be paid in most cases on the retained earnings of these institutions. The bill provides reserves consistent with the proper protection of the institution and its policyholders in the light of the peculiar risks of long-term lending on residential real estate which is the principal function of these institutions.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

These additions to bad-debt reserves provided by the bill should be sufficient to enable these mutual savings institutions to provide adequate returns to depositors and at the same time continue to provide a steady supply of capital to homebuyers of the Nation. [H.R. 10650, 87th Cong., 2d Sess., p. 33.]

Petitioner points out that section 593(b)(2) mentions a ceiling of 6 percent of "qualifying real property loans" and that mutual savings banks are in a less risky business than is petitioner. Petitioner thus concludes that, since the Commissioner's determination results in a less than 6 percent reserve, it must be arbitrary. Petitioner also emphasizes that for 2 of the years in issue (1961 and 1962), section 593 allowed for even larger reserves. We do not find, however, that section 593 provides any guidance for this case. The last sentence of the excerpt from the House report quoted above shows that in enacting section 593 Congress was not concerned solely with providing for a reserve sufficient to cover bad debt losses, but was more concerned with providing an adequate return to depositors and an adequate supply of capital to homeowners.

In contrast to the foregoing provisions relating to mutual savings banks, etc., Congress has not enacted similar provisions for business development corporations, although some 48 bills have been introduced to provide favorable treatment for such corporations.[7] We think that the past practice in respect of other financial institutions is not of great significance here. There were no special provisions relating to business development corporations during the tax years in question, and, as indicated above, footnote 6, what is a "reasonable" addition to petitioner's reserve must rest on facts that are applicable to petitioner.

In sum, although there may be persuasive reasons to support the action taken by petitioner, we cannot find that the Commissioner abused his discretion, and that is all that is before us.

*Decision will be entered for the respondent.*

---

[7] To the contrary, as indicated in fn. 5, *supra,* the House of Representatives on Aug. 7, 1969, passed H.R. 13270, which sharply limited additions to bad debt reserves by commercial banks, SBICs and business development corporations, based on, a 6-year moving average, and which also made extensive revisions in the provisions relating to mutual savings banks, etc., which were regarded as "unduly generous" and as providing such institutions with a "special tax benefit." H. Rept. No. 91–413 (Part 1), 91st Cong., 1st Sess., p. 125. To be sure, the Senate has not yet acted on these new provisions, and it is possible that they may be completely rejected. Nevertheless, the action of the House of Representatives in respect of H.R. 13270 when taken in conjunction with the inaction of Congress in respect of the 48 bills relating specifically to business development corporations has at least some relevance to whether the Commissioner acted arbitrarily here in determining what is *in fact* a "reasonable" addition to the reserve.