THE BRANERTON CORPORATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Branerton Corp. v. Commissioner
Docket Nos. 5040-73, 5042-73, 2871-74.
United States Tax Court
T.C. Memo 1976-365; 1976 Tax Ct. Memo LEXIS 38; 35 T.C.M. (CCH) 1658; T.C.M. (RIA) 760365; December 1, 1976, Filed Stephen L. Packard, for the petitioners. Peter Matwiczyk, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: In these consolidated cases, the respondent determined the following deficiencies in petitioners' Federal income taxes for the taxable years specified: Docket No.
Year
Deficiency
5040-73
FYE 3/31/67
$ 4,527.68
FYE 3/31/68
8,186.39
FYE 3/31/69
30,369.39
5042-73
1967
5,261.55
1968
7,207.04
2871-74
1969
4,692.17
1970
3,938.17
All issues raised by the petitioners save one have been resolved. The only issue remaining for consideration is whether respondent abused his discretion in disallowing deductions made by the corporate petitioner for additions made to its reserve for *39 bad debts. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner The Branerton Corporation is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York. It filed its Federal corporate income tax returns for the taxable years ending March 31, 1967, March 31, 1968, and March 31, 1969 with the Internal Revenue Service, New York, N.Y. Petitioners Jack and Anne Lindner are husband and wife residing in New York, New York, at the time the petitions were filed. They filed joint Federal income tax returns for the years 1967, 1968, 1969, and 1970 with the Internal Revenue Service Center at Andover, Massachusetts. [2]
Branerton is a financial intermediary. During the years in issue, it borrowed money from banks and reloaned the funds so obtained to small and mediumsized businesses which did *40 not have sufficient credit to obtain bank loans directly. For all of the years in question, petitioner used the reserve method of accounting for computing its bad debt deduction. As of April 1, 1966, the beginning of fiscal 1967, the reserve for bad debts had a balance of $24,100.00. In the following years, petitioner adjusted its reserve as follows: 3/31/67
3/31/68
3/31/69
Initial Reserve Level
$ 24,100.00
$31,000.00
$41,900.00
Charges Against Reserve
7,912.82
13,933.42
18.00
Additions to Reserve
[3] 14,812.82 24,833.42
58,757.00
Final Reserve Level
31,000.00
41,900.00
100,639.00
Petitioner had $823,258.25 in accounts receivable outstanding at the end of fiscal year 1966; $925,390.70 at the end of fiscal year 1967; $1,196,223.72 at the end of fiscal year 1968; and $1,006,390.82 at the end of fiscal year 1969. As of March 31, 1967, loans owed to petitioner totaling $35,712.30 were in default; as of March 31, 1968, loans totaling $8,027.05 were in default; and as of March 31, 1969, loans totaling $173,742.35 were in default. Each year, petitioner *41 calculated what it viewed to be a reasonable reserve for bad debts. It first examined the loans then outstanding to determine which loans, if any, were then in default. Consideration was then given to the change in the amount of receivables outstanding from the prior year and to any general economic condition which might affect the likelihood of losses. Any change in the rate of write-off by the company in prior years was also considered. No precise mathematical formula was used in these calculations. After the corporation calculated a reserve level, its accountants made an independent investigation to ensure that petitioner's calculated reserve was adequate to absorb anticipated losses. On or about November 6, 1968, petitioner loaned $105,000 to American Investors Corporation (AIC). The loan was evidenced by a promissory note due on July 18, 1969. A further $25,000 was advanced to AIC on or about January 16, 1969. Two promissory notes totaling this amount were executed and were payable on demand. On or about February 21, 1969, AIC failed to make a payment due on the January 1969 debt and, under an acceleration provision contained in the November 1968 note, petitioner demanded *42 payment from AIC of $105,000. The November 1968 note was assured by a bond of the Stuyvesant Insurance Company (hereinafter referred to as Stuyvesant), the operative provisions of which were as follows: THE CONDITION OF THE * * * OBLIGATION IS SUCH, that whereas, the said Principal [AIC] has by a certain agreement dated November 6, 1968, bound itself to the Obligee [Branerton] in the amount of ONE HUNDRED FIVE THOUSAND AND 00/100 ($105,000.00) DOLLARS only. This debt is evidenced by a promissory note, a copy of which is attached. NOW, THEREFORE, if said Principal shall faithfully perform the obligations of the agreement above cited, then this obligation to be void; otherwise to remain in full force and effect. HOWEVER, in no event, shall the obligation of Surety be greater than $105,000.00 including interest, costs and attorney's fees. IN THE EVENT of default by Principal, the Obligee shall give prompt written notice accompanied by a copy of the defaulted note, to THE STUYVESANT INSURANCE COMPANY * * *. Such notice shall in no event be given later than thirty (30) days from the date of default. However, in no event shall The Stuyvesant Insurance Company be liable *43 under this bond after August 18, 1969 unless notice has been received prior to such date, in accordance with the foregoing. The promissory note provided in part as follows: This is note No. of a series of notes. Upon default in the payment of any one of these notes or any other note or notes of the maker and/or endorsers and/or guarantors hereof, held or acquired by holder hereof all of the aforementioned notes shall immediately become due and payable without prior notice on demand. Based upon AIC's default in respect of payment due on the January 1969 debt, petitioner, on February 27, 1969, made a demand on Stuyvesant for immediate payment of the full $105,000. On March 3, 1969, in a letter to petitioner, Stuyvesant refused to honor the demand for payment. It stated that its obligation under the bond did not mature until the note was payable, i.e., on July 18, 1969. Stuyvesant further stated that "[this] letter is hereby written without prejudice to any and all rights of the Stuyvesant Insurance Company in this matter, none of which are hereby waived." On March 17, 1969, petitioner brought an action by way of a motion for summary judgment in the New York *44 State Supreme Court to collect on the assurance bond. As of March 31, 1969, this action was still pending. Stuyvesant opposed the motion, stating that its liability was established solely by the terms of the assurance bond and that the terms of the note signed by AIC, containing the acceleration clause, had no effect on Stuyvesant. In the affidavit in opposition, dated April 23, 1969, Stuyvesant's Bond Manager, after reciting the factual basis for Stuyvesant's position, stated, "It follows from the foregoing that plaintiff's proceeding at this time is substantively premature." On May 6, 1969, Branerton's motion was denied on the ground that a triable issue was raised as to whether Stuyvesant's bond was payable prior to July 18, 1969. Branerton moved for reconsideration of its motion on June 3, 1969, and, on August 27, 1969, a judgment was entered in favor of Branerton and against Stuyvesant for the $105,000, plus interest and costs. Stuyvesant satisfied this judgment in full on August 29, 1969. The January 1969 loan was secured by 10,000 shares of common stock of Tintair, Inc. (Tintair). [4] When AIC failed to make the payment due on this loan, Branerton attempted to sell the *45 Tintair shares through a brokerage company, which sold some of these shares at $3.50 and $3.75 per share, but the order was then canceled because Branerton failed to make proper delivery. Such failure stemmed from the fact that the shares were not registered in Branerton's name. On February 20, 1969, Branerton wrote to United States Corporation Company (USCC), the transfer agent for Tintair, requesting that the Tintair shares be registered in the name of Jack Lindner (who was president of Branerton). USCC refused to transfer the stock as requested until Branerton obtained an opinion from Tintair's counsel that the Tintair shares, which had not been registered, could legally be transferred under the Securities Act of 1933. On March 3, 1969, petitioner brought suit against USCC, requesting that USCC be directed to record Branerton as owner of the Tintair shares, that new certificates of stock be issued to Branerton, and that Branerton be awarded damages and costs. *46 On March 25 or 26, 1969, the Supreme Court of the State of New York granted petitioner a temporary injunction, which restrained USCC from interfering with the transfer of the Tintair stock by petitioner. The actual order was issued on April 8, 1969. On or about April 14 or 15, 1969, petitioner sold the Tintair shares for $19,690. Petitioner's suit for damages against USCC was ultimately settled out of court in June 1971. [5]
In calculating the reserves needed at the close of the fiscal year 1969, petitioner placed great weight on the fact that the loans to AIC, totaling $130,000, were then in default. After consulting with the banks that lent it money, petitioner believed that increasing the amount of reserves for bad debts was necessary to preserve its credit. However, none of the banks explicitly *47 suggested that petitioner increase its reserve or made such an increase a condition to future dealings with the banks. Petitioner's accountants conducted a certified audit every year within 45 days of the close of the fiscal year. In 1969, the audit began in April and the field work was completed during the last week of that month. Petitioner obtained automatic extensions of the time within which to file its fiscal 1967 and 1968 tax returns until September 15 and an extension until December 15, 1969 for its fiscal 1969 return. Respondent disallowed deductions claimed for additions made to the reserve for bad debts to the extent that such additions exceeded the charges made against the reserve. In making this determination, respondent calculated the amount of reserves necessary to absorb the amount of bad debts that petitioner would be expected to incur during the following fiscal year. This calculation was based on petitioner's experienced losses from bad debts. For example, in deciding whether the reserve at the end of 1967 was sufficient to absorb the bad debt losses likely to take place in 1968, the ratio of total bad debts for the years 1962 through 1967 to the total *48 accounts receivable for the same period was calculated. This ratio was multiplied by the amount of receivables outstanding at the end of 1967 to produce the estimate of debts that would go bad in 1968. The amount so calculated was the level of reserve for bad debts which respondent determined to be justified solely by experienced losses at the end of 1967. For the year 1967, the level of reserves deemed reasonable by the respondent was $3,701; for 1968, the level was $7,177; and for 1969, the level was $5,233. OPINION In its tax returns for the fiscal years 1967, 1968, and 1969, petitioner claimed deductions for additions made to its reserve for bad debts. Respondent disallowed the deductions so claimed to the extent that such additions exceeded the actual debts charged against the reserve, i.e., respondent determined that the reserve of $24,100 which petitioner had at the beginning of the period was adequate. Petitioner claims that respondent abused his discretion in making the determination that the full additions claimed by petitioner were unreasonable. Taxpayers are permitted to deduct a "reasonable addition to a reserve for bad debts" in lieu of deducting bad debts *49 only when they become worthless. Section 166(c). [6] Respondent's regulations flesh out the statutory provision as follows: What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. [Sec. 1.166-4(b)(1), Income Tax Regs.] We see no purpose to be served in analyzing the plethora of cases in the area. It is sufficient for our purposes to note the following governing principles: (a) it is not enough for petitioner to establish that its claimed additions were reasonable and consistent with sound business judgment (see S.W. Coe & Co. v. Dallman,216 F. 2d 566, 570 (7th Cir. 1954); *50 Roanoke Vending Exchange, Inc.,40 T.C. 735, 741 (1963)); [7] (b) petitioner must also show that respondent's disallowance of the claimed additions constituted an abuse of discretion (see Westchester Development Co.,63 T.C. 198, 211 (1974); Massachusetts Business Development Corp.,52 T.C. 946, 951 (1969)); (c) although a taxpayer's bad debt history cannot in and of itself provide the foundation for determining the reasonableness of a bad debt reserve for a prior year or years, subsequent events can be taken into account by way of confirmation of the reasonableness of the prior estimate ( James A. Messer Co.,57 T.C. 848, 865 (1972)); [8] (d) the critical question is not whether the claimed additions to the reserves should be allowed but whether the balance in the reserve as finally allowed is adequate (see Massachusetts Business Development Corp.,supra at 952); (e) although the use of a rigid formula in disregard of established and significant facts might constitute an abuse of discretion by respondent, such use is not per se unreasonable (see S.W. Coe & Co. v. Dallman,supra at 569). *51 [9] The burden on the petitioner is "greater than usual." See Investors Discount Corporation,48 T.C. 767, 772-773 (1967). See also Branerton Corp.,64 T.C. 191, 193 (1975), where, because of this element, we granted the petitioner herein discovery with respect to the basis for respondent's determination. Application of the foregoing principles to the facts herein clearly demands that respondent's determination must be sustained. With respect to fiscal years 1967 and 1968, petitioner's position rests on the assertions that certain loans were in default at the end *52 of each such year ($35,712.30 for 1967 and $8,027.05 for 1968), that certain debts became worthless in those years, and that its claimed additions were based upon its management's judgment as to which loans were in jeopardy. We were favored with no specific evidence as to the circumstances surrounding the defaulted loans, particularly with reference to the prospects for payment. When we couple this failure of proof with the fact that debts of only $13,933.42 were charged off in 1968 and only $18.00 in the year thereafter [10] (both of which amounts respondent allowed petitioner to restore to the reserve), it is obvious that respondent's determinations for those years cannot be held to have been arbitrary.
The situation with respect to fiscal 1969 requires somewhat more analysis. Petitioner claimed an addition of $58,757 to its bad debt reserve for that year, based primarily on the fact that two loans totaling $130,000 to AIC, secured in part and guaranteed in part, were in default at the close of the year.In addition to these problem loans, petitioner considered the general *53 economic climate and the fact that increasing its reserves would make it easier for petitioner to preserve its credit with the banks that lent it money. Respondent disallowed the amount of the deduction in excess of the $18.00, the bad debts actually charged against the reserve. Although a taxpayer employing the reserve method for accounting for bad debts may not charge a debt off against the reserve until that debt has become worthless, it may consider the circumstances affecting a specific debt in calculating the reasonable reserve needed for the coming year. Calavo, Inc. v. Commissioner,304 F. 2d 650 (9th Cir. 1962), revg. a Memorandum Opinion of this Court dated November 17, 1960. See Petaluma Co-operative Creamery,52 T.C. 457, 467-468 (1969). And even though losses are guaranteed or secured, it is reasonable to anticipate that some losses will occur. Southeastern Finance Co.,4 T.C. 1069(1945), affd. 153 F. 2d 205 (5th Cir. 1946). However, in considering the reserves necessary to absorb losses from secured loans in default, the security for the loans must be considered. Massachusetts Business Development Corp.,supra at 957. *54 Of these loans, $25,000 was secured by 10,000 shares of Tintair stock. Petitioner argues that, at the end of the fiscal year 1969, it was not certain that it would be able to sell these shares for cash, due to the refusal of the transfer agent for the Tintair stock to put the shares in petitioner's name. We cannot accept this argument. We see no need to review in detail the circumstances surrounding the vitality of this portion of the AIC loans, which are set forth in our findings of fact. See pp. 9-10, supra. The salient fact is that, prior to the close of the fiscal year, petitioner had obtained a decision which had the effect of permitting it to sell the Tintair shares, with the result that there was good reason for petitioner to believe that a substantial portion of this indebtedness would be paid. This forecast was confirmed by the fact that, in a matter of days after the close of the fiscal year and long before the original due date of petitioner's return (not to mention the extended date for the filing thereof until December 15, 1969), petitioner received $19,690 from the sale. Even if we assume that petitioner's potential for further realization on its claim for *55 damages against that transfer agent should not be taken into consideration (a problem which we expressly do not resolve), its $24,100 reserve for bad debts was more than ample to absorb the $18.00 actual loss during that year and the additional potential loss of $5,310 ($25,000 less $19,690), as well as any additional losses indicated by petitioner's prior bad debt experience. The remaining $105,000 of the $130,000 loan to AIC was secured by a bond issued by Stuyvesant. Here again there is no need to regurgitate the details set forth in our findings of fact regarding Stuyvesant's initial refusal to honor its bond and the subsequent litigation related thereto. See pp. 6-9, supra. It is sufficient to record that the only apparent bone of contention between petitioner and Stuyvesant related to the time when Stuyvesant was required to pay and that was at the latest in July 1969. Under these circumstances, there was little, if any, doubt as of the close of the fiscal year that the $105,000 would be paid and this reading of the situation is confirmed by the fact that petitioner received the full amount by the end of August 1969 -- long before the time when it was required to file *56 its return. Consequently, we cannot conclude that respondent was arbitrary in refusing to permit an augmentation of petitioner's bad debt reserve in respect of this indebtedness.
The nub of petitioner's principal argument is that we should freeze the situation as of March 31, 1969 in order to sustain its evaluation of the AIC loans. Petitioner's position is totally unrealistic. As we have already indicated, even if we were to accede to petitioner's blandishment, there was enough evidence in hand as of that date to justify our sustaining respondent's determination. But the fact of the matter is that we may take into account subsequent events, albeit we are required to do so judiciously (see pp. 14-15, supra) and those events clearly confirm the validity of our judgment of business realities as against any legalistic or mechanical view of the situation. See and compare Malone & Hyde, Inc.,49 T.C. 575, 578 (1968). We are equally unpersuaded by petitioner's attempt to rely on the alleged inhibitions arising out of its banking relationships and on the claimed impact of economic conditions in the industry. The fact that a bank directs a taxpayer to keep a certain *57 reserve is insufficient to justify deducting under section 166(c) additions made to reach that level. Atlantic Discount Company, Inc. v. United States,473 F. 2d 412, 415 (5th Cir. 1973); Roanoke Vending Exchange, Inc.,40 T.C. 735, 744 (1963). While management's judgment as to the economic climate or condition of an industry may be important in determining the reserves that a business keeps for its own protection, it is not sufficient to justify the amount of a bad debt reserve, at least in the absence of concrete evidence relating thereto (which is not contained in the record herein). Atlantic Discount Company, Inc. v. United States,supra at 415; Massachusetts Business Development Corp.,supra at 954-955; Mill Factors Corporation,14 T.C. 1366, 1374 (1950). The long and the short of this case is that petitioner has failed to persuade us that there were special circumstances that would justify the conclusion that respondent abused his discretion in refusing to allow petitioner a bad debt reserve in excess of $24,100. To reflect the concessions of the parties on other issues, Decisions *58 will be entered under Rule 155. Footnotes
1. The following proceedings are consolidated herewith: Jack Lindner and Anne Lindner, docket No. 5042-73; Jack Lindner and Anne Lindner, docket No. 2871-74.↩
2. Because all of the issues relating to the deficiencies of Jack and Anne Lindner have been resolved, the term "petitioner" will hereinafter refer solely to The Branerton Corporation.↩
3. The parties stipulated this amount to be $14,812.12 in an obvious typographical error.↩
4. The promissory notes evidencing the $25,000 loan indicate that the 10,000 shares of Tintair were to secure $22,500 and that 205 shares of National Industries, Inc., were to secure the remaining $2,500. The terms of the promissory notes provided that the property securing the notes was also to be used as security for all other liabilities of the debtor owed to Branerton. No further mention is made of the National Industries, Inc., shares anywhere in the record, and we thus make no findings concerning these shares. The parties have stipulated that the Tintair shares constituted security for the $25,000 loan, and we have so found.↩
5. No evidence was presented concerning the amount of monetary damates, if any, recovered by petitioner under this settlement, and we, therefore, make no finding as to such an amount. The prices of the Tintair shares during the period February 20, 1969 through April 16, 1969 were as follows: ↩
High bid:
3-3/4
High ask:
4-1/4
Low bid:
2
Low ask:
2-1/4
6. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.↩
7. See also Commercial Capital Corp.,T.C. Memo. 1968-186↩. 8. Compare Gold-Pak Meat Co., Inc.,T.C. Memo. 1971-83, and Anna Neuman,↩ a Memorandum Opinion of this Court dated October 3, 1950. 9. In the instant case, respondent used the so-called Black Motor Formula (see Black Motor Co.,41 B.T.A. 300 (1940), affd. 125 F. 2d 977↩ (6th Cir. 1942)) and determined that the justifiable reserve under that formula was $3,701 in 1967, $7,177 in 1968, and $5,233 in 1969 -- amounts far less than the amount allowed.
10. We were furnished with no evidence as to petitioner's bad debt experience subsequent to fiscal 1969.↩